MONSANTO COMPANY, Plaintiff-Appellee, *v.* WALTER E. HELLER & COMPANY, INC., Defendant-Appellant—(Ilikon Corporation, Defendant).

First District (1st Division) No. 82—0548

Opinion filed May 23, 1983.

Greenberger, Krauss & Jacobs, Chartered, of Chicago (Maurice Jacobs, James T. Ryan, and Timothy R. Conway, of counsel), for appellant.

Gardner, Carton & Douglas, of Chicago (Gordon B. Nash, Jr., David F. Heroy, and Michael P. Padden, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Monsanto Company (Monsanto) is a Delaware corporation with its principal place of business in Missouri. During the period relevant to this litigation, Ilikon Corporation (Ilikon) was an Illinois corporation engaged in the business of manufacturing plastic tubs and cups from raw plastic resin materials. Monsanto was Ilikon's principal or exclusive supplier of raw plastic resins. Walter E. Heller & Company, Inc. (Heller), is a national financing company based in Chicago. At the time the instant cause of action arose, Heller had several loans to Ilikon outstanding, all of which were secured by a perfected security interest under article 9 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—101 *et seq.*) (the Code) in all of Ilikon's machinery, equipment, real estate, inventory including raw materials, and all existing and after-acquired accounts receivable.

Monsanto brought this action against Heller to reclaim certain goods that Monsanto had sold to Ilikon in January of 1979. Monsanto sought to reclaim the goods under four alternative theories: (1) the "cash sale" provisions of section 2—507(2) of the Code; (2) the "credit sale" provisions of section 2—702(2); (3) conversion; and (4) unjust enrichment. In addition, Monsanto sued Heller for nonpayment under a written guaranty. The trial court entered judgment for Monsanto on all counts. The guaranty was subsequently satisfied by Heller, and this appeal is taken from only that portion of the judgment relating to the goods. The crux of Heller's argument on appeal is that Monsanto failed to satisfy the narrow statutory exceptions for reclaiming cash or credit sellers under the Code and that, in any event, Monsanto's rights as a reclaiming seller are subordinate to Heller's rights as a "good faith purchaser for value" by virtue of its perfected security interest in the goods. (Ill. Rev. Stat. 1981, ch. 26, par. 2—403(1).) Heller also contends that Monsanto should not be able to circumvent the specific statutory provisions of the Code by invoking the common law remedies of conversion and unjust enrichment.

We affirm the trial court, based on our finding that Heller, by its conduct, failed to come within the definition of "good faith purchaser" as contemplated by the Code and thus did not acquire rights superior to those of Monsanto, a reclaiming seller under either the

cash or credit sale provisions of the Code. Our review of the record reveals the following relationship and course of dealings between the parties:

A. *The Heller/Ilikon Relationship.*

In 1973, Ilikon purchased a plant from Monsanto in Bridgeview, Illinois, which manufactured plastic containers from certain raw plastic resins. Ilikon obtained financing from Heller in connection with the purchase and operation of the plant. Ilikon sustained financial losses from that time forward, however, and in June of 1977 came under new management. As a result of this change there was a substantial restructuring of the parties' previous loan arrangements, and by June 30, 1977, Heller had four loans outstanding to Ilikon: $1.2 million secured by all of Ilikon's machinery, equipment and real estate; $1.22 million secured by Ilikon's inventory; $1 million secured by Ilikon's inventory; and a revolving loan secured by Ilikon's accounts receivable. All four of the loans provided that the collateral for each would secure any and all indebtedness of Ilikon to Heller. Heller advanced no new funds to Ilikon against its inventory, machinery or equipment loans after June 30, 1977, and Ilikon's only source of funds after that time was its revolving accounts receivable loan from Heller. Under the loan agreement, Ilikon's customers remitted all funds directly to Heller at a lockbox at the La Salle National Bank (the Bank) in Chicago. From June 30, 1977, through January 26, 1979, Heller advanced sums to Ilikon pursuant to an established procedure which involved daily telephone conversations between a Heller vice-president, Michael Forte, and Thomas Detrick, treasurer of Ilikon. During these conversations, Detrick would inform Forte of the following: Ilikon's sales of the prior day; the amount collected in Heller's lockbox and the prior day's balances in Ilikon's accounts at the Bank; the amount of checks previously written by Ilikon that had not yet cleared the Bank and the amount of cash required to cover checks previously written that were to clear the Bank that day, as well as general business information concerning Ilikon and Monsanto. Forte would advise Detrick of the funds which were available to Ilikon under the formula contained in the parties' loan agreements and the funds that Heller would agree to transmit at that time. Heller would then by wire transfer the funds to Ilikon's accounts.

Heller monitored its loans to Ilikon by auditing Ilikon's books and records and examining its assets and facilities from time to time. Heller also required regular written financial reports from Ilikon, including daily reports of bank balances, sales collections and accounts re-

ceivable, raw materials received and monthly inventory reports.

B. *The Monsanto/Ilikon Relationship.*

Monsanto was Ilikon's principal supplier of raw plastic resins until November of 1978, when it became Ilikon's exclusive supplier. In June of 1977, Monsanto agreed to extend Ilikon a $200,000 line of credit which was expressly induced by Heller's $100,000 guaranty. By agreement of the parties, this credit limit had been increased to $400,000 and Heller's guaranty to $200,000 by January of 1979. The trial court found that it was the intent of the parties that as long as Monsanto managed its credit limit of $400,000, it would at no time be exposed to a loss of more than $200,000 in connection with its sale of goods to Ilikon.

In order to insure that Ilikon was at or near its credit limit at all times, Monsanto followed a regular procedure (the Procedure) whereby its salesman, Bruce Kleinert, would regularly visit the Ilikon facility to receive orders and demand payment. The parties were unable to determine the precise dollar value of the intended shipments prior to actual shipment because the materials were charged for by the pound and the shipments were not weighed until they left Monsanto's docks. Therefore, Ilikon would pay for the goods by tendering a check for the approximate value of the shipment ordered, which amount would be slightly more or less than the actual value of the shipment, depending on its weight. For accounting purposes, the amount was credited to and always equaled the oldest outstanding invoice for the same approximate dollar amount ordered. After receiving a check from Ilikon, Kleinert would telephone Monsanto's home office, causing a shipment to be released to Ilikon that same day. Kleinert would then send the checks by regular mail to Monsanto's corporate headquarters in St. Louis for eventual presentment at Ilikon's bank in Chicago. Monsanto does not deny its knowledge that Ilikon "played the float" with its checks and that when it received the checks from Ilikon the latter did not have the funds on hand to cover them, the payment of those checks being dependent upon Ilikon's obtaining loans from Heller. Heller, with full knowledge of Ilikon's practice, continued furnishing funds to cover the checks when they reached the bank.

The above Procedure was followed by the parties from June 30, 1977, until January 15, 1979, during which time no check tendered by Ilikon was returned for insufficient funds. The trial court found that Monsanto regularly changed its position during this time by shipping additional goods to Ilikon in reliance on Kleinert's receipt of checks

which, Monsanto believed, would maintain the $400,000 credit limit. Heller was made aware of the Procedure through the daily telephone conversations between Detrick and Forte.

The specific transactions giving rise to Monsanto's cause of action occurred from January 8, 1979, through January 16,1979, during which time Monsanto caused to be delivered 10 shipments of raw resins to Ilikon in the aggregate amount of $146,410.55. All of the sales were made pursuant to the Procedure: Ilikon tendered seven checks to Monsanto during this period in reliance upon which Monsanto released the goods; on January 12 Detrick informed Heller that Ilikon had written over $200,000 in checks to its suppliers which were about to be presented for payment and requested that Heller make an additional loan to cover the checks. Heller informed Ilikon of its refusal to cover the checks on January 16, knowing that they would be dishonored and returned by the Bank for insufficient funds. Heller also informed Monsanto and the Bank of its decision not to supply any additional funds to Ilikon. Five of Ilikon's checks written to Monsanto were subsequently dishonored. The remaining checks were never presented by Monsanto for payment, but the trial court found that they would have been dishonored and returned by the Bank if they had been presented.

On January 16 Detrick also informed Monsanto's credit manager that the checks given to Monsanto in exchange for the delivered goods would be returned, in response to which Monsanto demanded return of the delivered goods pursuant to its rights as a reclaiming seller under the Code. Monsanto also advised Heller that it was stopping all shipments to Ilikon because Ilikon's checks were being returned by the Bank. The shipments in exchange for the bad checks had already been delivered, however.

Kleinert and other Monsanto employees repeatedly contacted Ilikon between January 17 and January 26 to demand that Ilikon not use the delivered goods and that the goods be returned, in response to which Detrick represented that the goods would be available for retrieval but that an excess accumulation of snow on January 17 at the Ilikon facility would make such retrieval physically impossible at that time. In fact, record accumulations of snow in the area would have severely hindered the return of the goods between January 16 and January 26. During that period Ilikon, with Heller's knowledge, continued manufacturing operations, converting the delivered goods into finished plastic tubs and cups.

On January 18, executives of Heller, Ilikon and the Bank met to discuss the financial future of Ilikon. The following day, contrary to

its previous representations, Heller advanced $11,000 to Ilikon for the purchase of color concentrate needed for its continuing manufacturing operations. The funds were transferred to a previously dormant bank account in New York rather than to Ilikon's bank in Chicago, which would have used the funds to cover checks previously written to other suppliers, including Monsanto. On January 22 and 26 Heller also advanced substantial sums to Ilikon's separate payroll account in Chicago for the purpose of maintaining Ilikon's continued manufacturing operations.

On January 25, 1979, Ilikon notified Heller and Monsanto that as of 4 p.m. of the following day all of its operations would cease, its officers and directors would resign and its assets would be tendered to Heller. Heller obtained possession of Ilikon's former assets at that time and continued operations limited to printing labels for the finished tubs and cups. On January 26 Monsanto requested that Heller return the delivered goods and any finished products of the goods. Heller failed to comply with Monsanto's demand and, despite repeated requests by Monsanto not to proceed, on January 31 Heller began selling Ilikon's inventory of finished products for its own accounts until restrained by court order on February 13, 1979.

The trial court dissolved the restraining order on February 20, 1979, allowing Heller to continue its sales of inventory and directed that all proceeds from the sale of inventory manufactured from the goods supplied by Monsanto be deposited in designated interest-bearing accounts at a rate of 5¾% in the joint names of Monsanto and Heller. From February 20, 1979, through the date of entry of judgment, $27,127.27 had accrued at that rate on the principal sum of $146,410.55.

Trial commenced on July 13, 1981. After lengthy proceedings, during which the court heard extensive testimony by the parties, a final order was entered on February 4, 1982. The order contains numerous findings of fact and conclusions of law, including the following:

That during the period from June 30, 1977, through January 15, 1979, Monsanto's sales to Ilikon in accordance with the Procedure were cash sales under section 2—507 of the Code which requires that a sale be a delivery "where payment is due and demanded" in order to be a cash sale (Ill. Rev. Stat. 1981, ch. 26, par. 2—507(2)) and that such was the intent of the parties; that Monsanto complied with the Code's requirements for reclaiming cash sellers (Ill. Rev. Stat. 1981, ch. 26, par. 1—101 *et seq.*) by demanding return of the delivered goods within 10 days of their delivery and that Heller's priority by

virtue of its article 9 security interest in the inventory must fail because Heller did not act in good faith and cannot be considered to be a "good faith purchaser for value" as required by section 2—403 of the Code. (Ill. Rev. Stat. 1981, ch. 26, par. 2—403.) The court also concluded that, in the event Monsanto's sales to Ilikon were credit sales, Ilikon received the delivered goods while insolvent and Monsanto therefore complied with all of the requirements for reclamation under the credit sales provisions of the Code. Ill. Rev. Stat. 1981, ch. 26, par. 2—702.

In addition, the court found that Heller's security interest did not attach to the delivered goods because Ilikon had no "rights in the collateral" (Ill. Rev. Stat. 1981, ch. 26, par. 9—203(1)(c)) and because Heller did not give new value against them as required by section 9—203 of the Code (Ill. Rev. Stat. 1981, ch. 26, par. 9—203(1)(b)); that Heller converted the delivered goods to its own use; that Heller would be unjustly enriched by the value of the delivered goods and that Heller is equitably estopped from asserting any rights in the delivered goods due to its and Ilikon's course of dealings with Monsanto.

Heller first argues that the trial court's finding that Monsanto's sales to Ilikon in accordance with the Procedure were cash sales is against the manifest weight of the evidence because it was based on the court's erroneous belief that payment was "due and demanded" for the goods upon their delivery within the meaning of section 2—507(2) of the Code. (Ill. Rev. Stat. 1981, ch. 26, par. 2—507(2).) As Heller correctly states, this section does not afford relief to a seller who, at the time of delivery of goods, merely demands payment for other goods previously shipped. (*In re Kee Lox Manufacturing Co.* (E.D. Pa. 1977), 22 U.C.C. Rep. Serv. 938.) Heller argues that the evidence presented, including sales agreements between Monsanto and Ilikon drafted prior to 1977 listing "net 30 day" credit terms, the guaranty from Heller to Monsanto, the purpose of which was to cover Ilikon's credit purchases, and the testimony of Ilikon's chief financial officer require a contrary conclusion.

■ In determining whether the transactions involved were cash or credit sales, the trial court properly considered the intent of the parties. (*In re Helms Veneer Corp.* (W.D. Va. 1968), 287 F. Supp. 840.) There is no question but that Monsanto's agreement to extend Ilikon an initial $200,000 line of credit on June 30, 1977, was induced by Heller's guaranty for one-half of that amount (these amounts were later increased proportionately). The court found that the parties intended by the terms of the guaranty and Monsanto's $400,000 credit limit that, as of June 30, 1977, Monsanto would effectively limit its

exposure to a loss of not more than $200,000 in connection with its sale of goods to Ilikon. Once Ilikon had reached the credit limit, all sales were made strictly in accordance with the Procedure; by demanding payment by check prior to the release of any new shipment, Monsanto incurred no new risk in its subsequent sales to Ilikon. In the words of Monsanto's salesman, the parties were "trading dollars for pounds."

Heller relies principally on *In re Kee Lox Manufacturing Co.* (E.D. Pa. 1977), 22 U.C.C. Rep. Serv. 938; however, the facts in that case are distinctly different from the case now before us. *Kee Lox* involved a single, isolated transaction. There, the existing practice between the parties was the sale of goods on credit. Each month Kee Lox would send Pram, Inc., its seller, a check on account of previous purchases. Kee Lox fell behind in its payments and Pram withheld all future shipments until Kee Lox "reduced" its account. Upon receiving a check from Kee Lox, Pram shipped goods worth a substantially higher amount. When Kee Lox' check was subsequently dishonored, Pram sought reclamation under the cash sale provisions of the Code. In rejecting Pram's contention that the transaction involved was a cash sale, the court distinguished *In re Mort Co.* (E.D. Pa. 1962), 208 F. Supp. 309, a case in which Mort, the bankrupt, a credit buyer, had called a creditors' meeting in order to effectuate a settlement. By agreement, Mort continued to operate its business, but all purchases were to be on a c.o.d. basis. Some months later, goods were delivered in exchange for a check which was subsequently dishonored. Within 10 days, the seller sought reclamation under section 2—507(2). As stated by the court in *Kee Lox*, "it is clear to us that the agreement in Mort, to pay cash for all goods received, is different from the agreement between Kee Lox and Pram, to make a payment on account of an old bill." 22 U.C.C. Rep. Serv. 938, 941.

After hearing the evidence, the trial court found that the parties here sought to maintain an established credit limit and that this was done by strict adherence to the prescribed Procedure for a period of 20 months. The court concluded that these actions effectively made all sales by Monsanto to Ilikon during this period "cash sales." We cannot say that the court's conclusion is against the manifest weight of the evidence. Nevertheless, we find that even if the subject transactions were considered credit sales, Monsanto must still prevail as a reclaiming credit seller under the Code.

■ Heller argues that Monsanto's credit sales reclamation remedy under section 2—702(2) is barred by its knowledge of Ilikon's insolvency at the time the goods were delivered. That section provides:

"Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within 3 months before delivery the 10 day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay." Ill. Rev. Stat. 1981, ch. 26, par. 2—702(2).

Monsanto does not claim that Ilikon misrepresented solvency; both parties were aware that Heller was Ilikon's only source of cash and had absolute control of Ilikon's cash flow on a daily basis after June 30, 1977. Heller claims that Monsanto was required to prove at trial that it first *discovered* Ilikon's insolvency after the goods were delivered. The cases cited by Heller in support of this supposed requirement, however, simply state that the reclaiming seller's demand must be made within 10 days of receipt of the goods by an insolvent credit buyer. There is no question but that Monsanto satisfied this requirement.

Heller relies on *Theo. Hamm Brewing Co. v. First Trust & Savings Bank* (1968), 103 Ill. App. 2d 190, 242 N.E.2d 911. In that case, Hamm, the credit seller, failed to make its demand within the 10-day limit, then claimed reliance on its buyer's dishonored checks as "written misrepresentations of solvency" within three months of delivery in order to get around the strict 10-day requirement. The court rejected Hamm's claim, finding that in light of Hamm's knowledge of its buyer's financial condition, including prior experiences in receiving bad checks, Hamm could not have relied on these checks as "written misrepresentations of solvency" under section 2—702(2). In explaining the necessity of the written representation and the seller's reliance thereon, the court emphasized its concern that, without such a requirement, section 2—702 could be utilized to protect a seller who continues selling to a buyer he knows to be insolvent, then reclaims the property when the buyer doesn't pay as promised or when another party appears on the scene. "[The Code] requires dealing in good faith *** and would seem to require that a seller not be able to profit by such a course of conduct." 103 Ill. App. 2d 190, 196.

We believe that the reasoning applied in *Hamm Brewing* supports Monsanto's position here. Unlike the seller in *Hamm*, Monsanto had every reason to expect payment of the January 1979 checks based on Heller's previous conduct of covering the checks for a period of 20 months, during which time Monsanto had never received a bad check

from Ilikon. By cutting off funds to Ilikon without previous notice, Heller violated a tacit understanding that Monsanto would not be exposed to more than $200,000 risk from its sales to Ilikon. Under those facts, Heller was far from the innocent third party over which the court in *Hamm Brewing* expressed its concern.

Even if the literal discovery of insolvency restriction urged by Monsanto were to be adopted by this court, Monsanto complied with this condition because it did not actually discover Ilikon's "insolvency" until January 16, 1979, when it learned that the forthcoming checks would be dishonored. The Code offers a choice of definitions of insolvency:

> "A person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law." (Ill. Rev. Stat. 1981, ch. 26, par. 1—201(23).)

The Seventh Circuit, in interpreting this section, rejected application of an absolutely literal meaning to the language of the Code and found that what is "insolvent" under the Code is not restricted by that definition, but "must rest on the facts of each transaction." (*In re Creative Buildings, Inc.* (7th Cir. 1974), 498 F.2d 1, 3.) The court further stated that "[t]here are a variety of business transactions in which for one reason or another NSF checks issue either through mistake, or miscalculation, or good faith reliance by the drawee on anticipated income." 498 F.2d 1, 2-3.

In the instant case, both Monsanto and Ilikon operated for 20 months in reliance on Heller's continued funding of Ilikon. The surrounding circumstances clearly show that Ilikon's balance sheets or operating loss were irrelevant to Monsanto's good-faith expectation of payment, and when Monsanto "discovered" Heller's action in cutting off funds to Ilikon it acted immediately by sending the required reclamation demand. We do not believe that the language and policy behind section 2—702(2) require anything more.

■ Heller next argues that even if Monsanto met the statutory prerequisites for a reclaiming seller under either section 2—507(2) or 2—702(2), the trial court erred in giving Monsanto's claims priority over Heller's rights as a "good faith purchaser for value" within the meaning of section 2—403(1). The trial court concluded that Heller did not act in good faith and therefore was not entitled to the priority given to secured lenders under the Code. Heller contends that the Code definition of "good faith" simply requires "honesty in fact in the conduct or transaction concerned" (Ill. Rev. Stat. 1981, ch. 26, par.

1—201(19)), and argues that as against Monsanto, "a sophisticated party with full knowledge of the risks and benefits involved in dealing with an insolvent buyer such as Ilikon," Heller cannot be found to have been deceptive or dishonest. Heller also argues that the good faith requirement cannot be interpreted so as to require a secured party to continue funding a "doomed enterprise."

While we agree that a secured lender is not expected to extend unlimited credit for an indefinite period in the absence of an express agreement, "good faith" under the Code has been held expressly to require that parties engage in "reasonable commercial standards of fair dealing." (See *In re Samuels & Co.* (5th Cir. 1976), 526 F.2d 1238, 1243, *cert. denied* (1976), 429 U.S. 834, 50 L. Ed. 2d 99, 97 S. Ct. 98.) As stated by Professor Grant Gilmore, a well-known Code scholar, good faith is an overriding purpose of the Code. (See Gilmore, *The Good Faith Purchase Idea and the Uniform Commercial Code: Confessions of a Repentant Draftsman*, 15 Georgia L. Rev. 605, 629 (1981).) The standard for determining "good faith" is a subjective one and rests on the facts of each case. *Walter E. Heller & Co. v. Convalescent Home* (1977), 49 Ill. App. 3d 213, 222, 365 N.E.2d 1285, *appeal denied* (1977), 66 Ill. 2d 637.

Given the course of dealing between the parties, Heller's direct involvement with the operation of Ilikon and with Ilikon's transactions with its suppliers, we believe that the instant case is factually distinguishable from those cases cited by Heller, and the trial court correctly concluded that Heller was not entitled to the priority of a "good faith purchaser for value" under section 2—403(1). Having concluded that Monsanto is entitled to reclamation under the provisions of sections 2—507(2) or 2—702(2) of the Code, we need not address the remaining common law claims of conversion and unjust enrichment.

Lastly, we find no merit in Heller's argument that the trial court erred in entering judgment for goods not claimed in Monsanto's reclamation demand and in awarding prejudgment interest. Monsanto demanded and is clearly entitled to recover damages in the amount of the value of *all* goods delivered in exchange for the dishonored checks. The undisputed invoice value of these goods totaled $146,410.55, the principal amount upon which the trial court entered judgment. Pending resolution of the dispute, the court ordered that all proceeds from the sale of Ilikon's inventory be placed in jointly held interest-bearing accounts, and upon finding for Monsanto on its claims regarding the goods, the court entered judgment in the principal amount to be paid from this account, plus all interest actually

earned on this sum at the rate of 5¾% in that account as of judgment date; and statutory interest from the judgment date, plus statutory costs. We find no error in awarding Monsanto only that interest that was actually earned on its own funds.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

McGLOON and CAMPBELL, JJ., concur.