## YAMAHA MOTOR CORPORATION, USA v TRI-CITY MOTORS AND SPORTS, INC

Docket No. 97913. Submitted October 6, 1987, at Marquette. Decided September 7, 1988.

On May 3, 1984, James W. Hamblen, co-owner and president of Tri-City Motors and Sports, Inc., entered into a dealer franchise agreement with Yamaha Motor Corporation, U.S.A., whereby he was authorized to sell at retail Yamaha products. On the same date Hamblen executed a security agreement with Yamaha which granted Yamaha a security interest in all motorcycles and their proceeds sold to Hamblen on credit. A financing statement to that effect was properly filed by Yamaha on May 9, 1974. On February 28, 1977, Hamblen, with Yamaha's knowledge, entered into a floor financing agreement with First National Bank and Trust of Menominee whereby the bank would loan funds to Hamblen for the purpose of purchasing motorcycles for the dealership and the bank would take a security interest in those motorcycles until they were sold at retail. The bank, rather than filing the financing statement with the Secretary of State as required to perfect its security interest, filed the statement with the Menominee County Register of Deeds. In early 1980, Hamblen ordered thirty-three motorcycles. Yamaha indicated that payment would have to be by certified check. Hamblen went to Yamaha's warehouse and paid for those motorcycles with three checks drawn upon Tri-City's corporate account in a Wisconsin bank upon which Hamblen had stamped certified, knowing that there were insufficient funds to cover the checks. Shortly after receipt of the motorcycles, Hamblen sold Tri-City to Lakeside Motors, with twenty-six of the newly acquired motorcycles being included in the inventory sold to Lakeside. Lakeside assumed Tri-City's debts. Prior to receipt of the new motorcycles, First National

REFERENCES

Am Jur 2d, Costs §§ 5-7.

Am Jur 2d, Equity §§ 103, 105.

Am Jur 2d, Secured Transactions §§ 286 *et seq.*, 385 *et seq.*, 476 *et seq.*, 486 *et seq.*

Creditor's duty of disclosure to surety or guarantor after inception of suretyship or guaranty. 63 ALR4th 678.

had released that portion of Tri-City's inventory it held as security for the then outstanding debt and had arranged a new floor financing plan whereby the newly ordered motorcycles were used to secure the new loan, which was in reality merely the rolling over of the prior debt. On May 9, 1980, Yamaha was informed by its bank that Hamblen's checks had been refused because of insufficient funds. Yamaha asked that the checks be presented again. On May 16, 1980, First National and Lakeside entered into a floor financing plan, the bank taking a security interest in the newly acquired motorcycles. On May 20, 1980, Yamaha was notified of the final refusal of payment on the checks given by Hamblen to pay for the motorcycles. Yamaha made no attempt to repossess the motorcycles, not wanting to jeopardize its business relationship with Lakeside Motors, and never informed the bank of the dishonored checks. Hamblen never made good on the checks. The motorcycles were sold and the proceeds were used to pay off the floor plan debt. In May, 1981, Yamaha filed suit in Menominee Circuit Court against Tri-City, James Hamblen and his wife, Carol Hamblen. In May, 1982, the bank was added as a party defendant. Yamaha moved for summary disposition as to all defendants. The trial court, John D. Payant, J., granted the motion as to Tri-City and James Hamblen, but denied it as to Carol Hamblen and the bank. The bank filed a cross-claim. Following a bench trial, the claim against Carol Hamblen was dismissed, and the trial court held that Yamaha was estopped from asserting the priority of its security interest by reason of its failure to immediately proceed to assert its claim to the property and to notify the bank of the dishonored checks. The court rejected Yamaha's constructive trust and third-party beneficiary theories and its request for exemplary damages and attorney fees. The bank's cross-claims were deemed to be moot in light of the disposition of the principal case. Yamaha appealed.

The Court of Appeals *held:*

1. Yamaha had no duty to notify the bank of the dishonored checks, and the decision not to immediately proceed against the property was a reasonable business decision under the circumstances. Accordingly, neither the failure to notify the bank nor the decision not to immediately seize the secured property acts to estop Yamaha from asserting the priority of its security interest.

2. Yamaha clearly decided to abandon its efforts to collect on the dishonored checks and rather seek enforcement of its security agreement.

3. Since neither party had a perfected purchase money

security interest, priority is determined by the earlier of either the date upon which the first filing covering the collateral was made or the date upon which the security interest was perfected. Since Yamaha's financing statement was first filed, Yamaha's security interest has priority.

4. Yamaha, to the extent of its security interest, is entitled to a constructive trust in the proceeds received from the sale of the motorcycles.

5. Yamaha is not entitled to either exemplary damages or attorney fees.

Reversed in part, affirmed in part.

1. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — GOOD FAITH — ESTOPPEL.

The holder of a prior security interest in goods is not required under the good faith provisions of Article 9 of the Uniform Commercial Code to immediately inform one who has a subsequently established security interest in the same goods under an independent security instrument of the fact that it was determined that the goods were purchased with a forged check; further, the priority security holder is not estopped from eventually asserting its security interest in the goods merely because it, for reasonable business reasons, forbore from immediately commencing legal process to protect its security interest (MCL 440.9105[4]; MSA 19.9105[4]).

2. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — PERFECTED SECURITY INTERESTS — FINANCING STATEMENT.

A security interest is perfected under Article 9 of the Uniform Commercial Code upon the occurrence of two events: (1) the interest must have attached, that is there must be an agreement that certain items are to secure payment or performance of an obligation, value is given and the debtor acquires rights in the collateral, and (2) the creditor must have taken all applicable steps for perfection, including, when required, the proper filing of a financing statement (MCL 440.9204[1], 440.9302[1], 440.9303, 440.9401[1]; MSA 19.9204[1], 19.9302[1], 19.9303, 19.9401[1]).

3. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — PERFECTED SECURITY INTERESTS — FINANCING STATEMENT.

A security interest under Article 9 of the Uniform Commercial Code is perfected at the time it attaches where the financing statement is filed prior to attachment (MCL 440.9303; MSA 19.9303).

4. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — PRIORITY OF INTERESTS.

Where parties hold conflicting security interests in the same collateral under Article 9 of the Uniform Commercial Code and no party has the advantage of the special priority status accorded purchase money security interests, priority between the conflicting interests is afforded to the security interest which is first filed covering the collateral or which is first perfected, whichever is earlier (MCL 440.9312[6]; MSA 19.9312[6]).

5. EQUITY — CONSTRUCTIVE TRUSTS.

A constructive trust in favor of the true owner may arise where a party mistakenly retains property or money which rightfully belongs to another.

6. COSTS — ATTORNEY FEES.

An award of costs and attorney fees is not permitted except when expressly authorized by statute, court rule or a recognized judicially created exception.

*Gerald Mason,* for plaintiff.

*Barstow, Selsor, Hoffman & Groulx, P.C.* (by *L. Grant Selsor*), for First National Bank & Trust of Menominee.

Before: MAHER, P.J., and McDONALD and R. C. LIVO,* JJ.

MAHER, P.J. This appeal as of right by plaintiff, Yamaha Motor Corporation, U.S.A., arises from a dispute over the competing security interests of Yamaha and defendant First National Bank and Trust of Menominee in the proceeds from certain motorcycles sold to defendant Tri-City Motors and Sports, Inc. The Menominee Circuit Court ruled in favor of First National, holding that Yamaha was estopped from asserting priority over the bank's security interest. Accordingly, the court entered a judgment of no cause of action against Yamaha on

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

December 29, 1986. We reverse in part and affirm in part.

On May 3, 1974, Yamaha entered into a dealer franchise agreement with defendant James W. Hamblen, president and co-owner of Tri-City. Pursuant to this agreement, Hamblen was authorized to retail Yamaha products, such as motorcycles, snowmobiles, components and accessories. Also on May 3, Hamblen executed a security agreement with Yamaha which granted the manufacturer a security interest in all motorcycles, and their proceeds, sold to him on credit. A financing statement to that effect was properly filed by Yamaha on May 9, 1974, thus perfecting its security interest. MCL 440.9302, 440.9303, 440.9401; MSA 19.9302, 19.9303, 19.9401.

Several years later, on February 11, 1977, First National notified Yamaha that it was considering entering into a floor plan financing agreement[1] with Tri-City. To this end, it requested a repurchase agreement from Yamaha whereby it could sell any motorcycles back to the manufacturer which it found necessary to repossess from Tri-City. On February 24, 1977, Yamaha agreed to this in order to induce the bank to issue "wholesale paper" to Tri-City which could be used to purchase Yamaha products. A similar repurchase agreement was given to First National approximately three years later on February 1, 1980.

On February 28, 1977, Hamblen entered into a security agreement with First National pursuant to the floor planning arrangement. The agreement

[1] Under a floor plan financing arrangement, the creditor loans the debtor the necessary funds to purchase the inventory or finance the business' operating expenses. The inventory is then pledged as collateral to secure the loan. As inventory is sold, the debtor applies a set percentage of the purchase price to the floor plan in satisfaction of that account. See White & Summers, Uniform Commercial Code (West, 1972), § 22-1, p 755.

provided that, in exchange for new value given to Hamblen for the purpose of purchasing new motorcycles, First National would obtain a security interest in the motorcycles. First National began floor planning new motorcycles for Hamblen the very next day.

On March 7, 1977, First National filed a financing statement, which listed only the motorcycles as the secured collateral, with the Menominee County Register of Deeds. Because that was not a proper situs for filing, it did not operate to perfect the bank's security interest. MCL 440.9303, 440.9401; MSA 19.9303, 19.9401.

On May 2, 1977, First National received notice of Yamaha's purchase money security interest (PMSI)[2] in all motorcycles and their proceeds which the manufacturer had sold, or will sell, to Tri-City or Hamblen on credit.

On December 18, 1978, Yamaha properly filed a continuation statement as to its earlier financing statement, thus continuing its perfected PMSI for another five-year period. MCL 440.9403(2); MSA 19.9403(2).

Between February 11, 1980, and April 2, 1980, Hamblen placed three orders with Yamaha for the purchase of thirty-three new motorcycles. Separate invoices were prepared for those orders, each of which indicated that payment was to be made "C.O.D.—certified funds only." Sometime thereafter, Hamblen drove to Yamaha's warehouse in Illinois to pick up the motorcycles. He paid for them with

---

[2] A PMSI is a security interest which is either (1) taken or retained by the seller of the collateral to secure all or part of its price, or (2) taken by a person who, by making advances or incurring an obligation, gives value to enable the debtor to acquire rights in or the use of collateral (assuming such value is so used). MCL 440.9107; MSA 19.9107. See also, 8 Anderson, Uniform Commercial Code (3d ed), § 9-107:4, p 572. In the instant case, Yamaha's security is of the former type of PMSI. First National's interest is of the latter type.

three checks written on Tri-City's corporate account and drawn on a Wisconsin bank. Hamblen had falsely stamped the checks "certified" because he lacked sufficient funds to cover the invoices and knew the warehouse workers would not release the motorcycles without the checks being certified. The forgeries went unnoticed, and Hamblen returned to Michigan with the motorcycles.

On March 20, 1980 (after the new motorcycles were ordered but before they were picked up), First National released that portion of Tri-City's inventory which it held as security for the then-outstanding debt of $49,656. Although the value of the released inventory was unknown, it seems certain that the debt was undersecured. According to Tri-City's records, Hamblen often sold motorcycles, which First National had floor planned, without making the corresponding debt reduction payments to the bank. At the time of the release, First National issued a check to Tri-City for $49,656 which was retained and used to pay off the entire floor plan debt. Immediately thereafter, the bank arranged a new floor plan with the dealership whereby the newly ordered motorcycles were to be used to secure a "new" loan in the amount of $49,574.

At the time the new floor plan was executed, Tri-City was not in possession of any of the motorcycles. In fact, Tri-City had not yet placed the last order and Yamaha had only prepared the first invoice. The new floor plan was apparently substituted for the original on the basis of either a handwritten list of the motorcycles ordered or copies of the orders themselves and Hamblen's assertion that he already possessed the collateral.

On May 6, 1980, Hamblen sold the dealership franchise, along with the equipment and inventory, to Lakeside Motors for $45,000 in cash and

assumption of Hamblen's then-outstanding floor plan debt of $46,408.[3] Twenty-six of the newly acquired motorcycles were included in the inventory which was sold to Lakeside Motors. Of the other seven motorcycles, Hamblen kept one for his personal use and had sold six previously.

On May 9, 1980, Yamaha was informed by its bank that Hamblen's checks had been refused because of insufficient funds. Pursuant to its policy, Yamaha asked that the checks be presented a second time to the Wisconsin bank on which they were drawn. Again they were refused. Yamaha was notified of the final refusal on May 21, 1980.

Earlier, on May 9 (the same day Yamaha first learned the checks had been refused), First National and Lakeside Motors entered into a security agreement which covered the new motorcycles listed on the substitute floor plan held by Hamblen and Tri-City. As per the agreement, Lakeside Motors delivered several trust receipts to First National for the twenty-six motorcycles. In so doing, it incurred a debt of $46,408—the exact amount owed by Tri-City prior to the franchise transfer.

On May 15, 1980, First National filed a financing statement with the local register of deeds. As before, this was an improper filing and did not perfect the bank's security interest. See MCL 440.9303, 440.9401; MSA 19.9303, 19.9401.

The next day, First National and Lakeside Motors entered into their own floor plan arrangement whereby the dealer received an approved line of credit of $35,000 with an outstanding debt of $46,408. The bank also drafted a check payable to

---

[3] There is a disagreement among the parties as to whether Lakeside Motors agreed to assume the debt. However, First National's records indicated a debt owing by Lakeside Motors in the amount of $46,408. Because the bank offers no explanation as to how the debt was incurred, and because it is the exact amount of Tri-City's outstanding debt, we can only surmise that Lakeside Motors assumed its predecessor's debt.

Lakeside Motors in the amount of $46,408, which it retained and presumably applied against the debt Lakeside Motors assumed from Tri-City during the franchise purchase.

On May 20, 1980, First National filed another financing statement covering the motorcycles and the proceeds therefrom. This time the filing was in the correct location (the Secretary of State's office) and, thus, perfected the bank's security interest. MCL 440.9401(1)(c); MSA 19.9401(1)(C).

After Yamaha received notice that Tri-City's checks had been refused a second time, it tried unsuccessfully to contact Hamblen. It never attempted, however, to repossess the motorcycles held by Lakeside Motors. Yamaha explained that it did not do this because it did not want to jeopardize its business relationship with Lakeside Motors or face a possible lawsuit for repossessing the motorcycles. Yamaha also never informed First National of the dishonored checks.

Hamblen did not make good on the checks. However, Lakeside Motors sold all the motorcycles and applied the proceeds therefrom to pay off its floor plan debt to First National. Yamaha did not receive any proceeds of the sales.

On May 19, 1981, Yamaha filed suit in the Menominee Circuit Court against Tri-City, Hamblen and his wife, Carol Hamblen. First National was added as a party defendant by stipulation on May 19, 1982. Subsequent to this, Yamaha filed a motion for summary disposition against all the defendants. The court granted the motion as to Tri-City and Hamblen,[4] but denied it as to Carol Hamblen and First National.

On September 17, 1985, First National filed a

---

[4] A judgment in the amount of $81,492 was ultimately entered against Tri-City and Hamblen. However, both of those parties have proved to be uncollectible.

cross-claim, and later moved for summary disposition, against Tri-City and Hamblen. The motion was denied by order of the court.

On April 28, 1986, a bench trial commenced as to Yamaha's remaining claims and First National's cross-claims. At the close of Yamaha's proofs, the court granted Carol Hamblen's motion to dismiss. MCR 2.504(B). At the conclusion of the trial, the court indicated it would take the other matters under advisement.

On December 3, 1986, the court issued an opinion and order in favor of First National for the reason that "Yamaha's actions were not an exercise in good faith, reasonableness and care." The court held that Yamaha had slept on its rights for two years and had failed to notify First National of the dishonored checks at a time when the bank could have protected its security interest. Consequently, Yamaha was estopped from asserting priority of its perfected PMSI. The court also rejected Yamaha's claims for recovery under theories of constructive trust and third-party beneficiary and for exemplary damages and attorney fees. Regarding First National's cross-claims, the court held them to be moot in light of the court's decisions in the principal case. A judgment of no cause of action was entered against Yamaha on December 29, 1986.

I

In this appeal we are confronted with several novel and complex issues involving various provisions of the Uniform Commercial Code, MCL 440.1101 *et seq.*; MSA 19.1101 *et seq.* Before discussing the particular issues raised herein, we must first mention some of the fundamental principles of the UCC by which we are guided.

The UCC is to be liberally construed and applied to promote its underlying purposes and policies of achieving uniformity, simplification, clarification, and modernization of the law relating to commercial transactions and to permit the continued expansion of commercial practices through custom, usage and agreement of the parties. MCL 440.1102(1), 440.1102(2); MSA 19.1102(1), 19.1102(2). White & Summers, Uniform Commercial Code (West, 1972), § 4, pp 14-15. Additionally, the remedies provided for in the UCC are to be liberally administered. MCL 440.1106; MSA 19.1106.

The UCC is a highly integrated body of statutes whose provisions must be carefully read as such. Fair and just application of the UCC rarely involves reference to only one or a few of its provisions in isolation. *Detroit Power Screwdriver v Ladney,* 25 Mich App 478, 484; 181 NW2d 828 (1970). For example, the general rules and definitions of Article 1 (e.g., freedom of contract, obligation of good faith) govern actions under Article 9 to determine and establish rights as between competing secured parties and as between secured parties and third persons. 79 Supp CJS, Secured Transactions, § 73, p 81. Moreover, unless displaced by a particular UCC provision, principles of law and equity (e.g., fraud, mistake, estoppel) apply as well. MCL 440.1103; MSA 19.1103.

When uniform laws such as the UCC have been adopted by several states, the courts of one state may refer to decisions from another state and may construe the statutes in accordance with the construction given by that state. If there is no harmony of construction among the various states, the forum court will adopt the construction which seems most reasonable. 2A Sutherland, Statutory Construction (4th ed), § 52.05, p 546.

The Official Comments appended to each section of the UCC, although lacking the force of law, are useful aids to interpretation and construction. *Szabo v Vinton Motors, Inc,* 630 F2d 1, 4 (CA 1, 1980); White & Summers, *supra,* § 4, p 11. The purpose of the Official Comments is to promote uniformity in construing the UCC. *Szabo, supra,* p 4.

II

The first issue presented on appeal is whether Yamaha breached an obligation of good faith and diligence owed to First National, thus estopping the manufacturer from claiming priority status in the proceeds of the motorcycles. We find that it did not.

Every contract or duty within the UCC, in general, and Article 9, in particular, imposes an obligation of good faith upon the parties in the performance or enforcement thereof. MCL 440.1203, 440.9105(4); MSA 19.1203, 19.9105(4). The Practice Commentary to § 1203, MCL 440.1203; MSA 19.1203, 21 MCLA 80 points out:

> [T]he good faith obligation applies to every contract *or duty.* This imposes the obligation of good faith not only on the parties to the contract but also on third persons who have duties arising out of their relationship to the transaction. [Emphasis in original.]

In the context of Article 9 secured transactions, good faith means honesty in fact in the conduct or transaction concerned. MCL 440.1201(19), 440.9105(4); MSA 19.1201(19), 19.9105(4); *Massey-Ferguson, Inc v Helland,* 105 Ill App 3d 648; 434 NE2d 295 (1982). The decision of the trier of fact regarding a party's good faith, or lack of good

faith, will not be reversed on appeal unless clearly erroneous. 1 Anderson, Uniform Commercial Code (3d ed), § 1-103:56, p 100. Assuming Yamaha was a third party with duties arising out of its relationship to the transaction in question,[5] we hold that the trial court clearly erred in finding that it had not acted in good faith in its dealings with First National.

It is important to note that the relationship between Yamaha and First National arises merely by coincidence of their holding separate security interests in common collateral. Hence, the situation herein is distinguishable from those cases cited by First National where one party fails to take action which could have protected the interest of the other party (or its obligor). See *Wayne Bank v Dore,* 119 Mich App 634; 326 NW2d 588 (1982); *International Harvester Credit Corp v Clenny,* 505 F Supp 983 (MD Ga, 1981). Furthermore, not only does Yamaha's security interest arise from a separate security agreement, but that interest was created prior to the interest of First National. The instant situation is therefore also distinguishable from those cases where an agent or fiduciary of the grantor is given a security interest which upsets the priority status of a prior secured creditor. See, e.g., *General Ins Co of America v Lowry,* 570 F2d 120, 121-122 (CA 6, 1978); *Thompson v United States,* 408 F2d 1075, 1084 (CA 8, 1969).

In contrast, the facts of the case at bar are closely analogous to the situation presented in

[5] It could be argued that Yamaha had no duty to act in good faith with First National since, technically, their interests arise by way of separate instruments. Therefore, their obligations run to the grantors of the security interests and not to each other. However, we believe the principles and purposes of the UCC are furthered by requiring competing secured parties to act in good faith when dealing with one another.

*Holiday Rambler Corp v Morris,* 32 UCCRS 1222
(D Kan, 1981). In that case, one secured creditor
(Holiday Rambler) claimed that a second secured
creditor (First National) had a duty to inform it of
the debtor's (Kansas Kamper's) pending insol-
vency. The United States District Court in Kansas
held:

> Nor can the court accept Holiday Rambler's
> contention that First National owed it any duty to
> inform it as to Kansas Kamper's precarious finan-
> cial position. Holiday Rambler was not First Na-
> tional's customer, and Holiday Rambler has not
> established any other sufficient fiduciary relation-
> ship between the parties: cases such as *Sparks v
> Guaranty State Bank,* 179 Kan 236 [293 P2d 1017]
> (1956), are therefore inapposite. [*Id.,* p 1227.]

Similarly, in the instant case, Yamaha was neither
a customer nor a fiduciary of First National.
Therefore, its failure to inform the bank of the
dishonored checks did not constitute a lack of good
faith.

For like reasons, we do not believe Yamaha's
failure to take immediate action against Hamblen
or Tri-City should estop it from asserting its prior-
ity status over First National.

> [D]elay after default of the debtor does not bar a
> creditor from asserting his priority. That is, the
> priority of a perfected security interest is not
> affected by the circumstance that the secured
> party, in order to assist the debtor, agreed not to
> declare him in default, as a secured creditor does
> not owe any duty to those holding subordinate
> interests to proceed to enforce his remedies. [9
> Anderson, *supra,* § 9-312:17, pp 266-267.]

Yamaha explained that its delay in enforcing the
security agreement was due to its desire to main-

tain a harmonious relationship with Lakeside Motors, its new franchisee. This was a reasonable business reaction. Yamaha was simply under no obligation to jeopardize its interests in order to protect the interests of First National.

First National asserts a number of reasons why Yamaha should be estopped from claiming priority status. Without naming each reason specifically, we find that Yamaha's conduct was not so misleading, unreasonable, or negligent as to estop it from exercising its priority over First National. The UCC enumerates specific measures a later creditor may take in order to protect its interest against an earlier secured creditor. MCL 440.9402; MSA 19.9402. Apparently, the protective measures were either never proposed or never consummated.[6] Moreover, Yamaha's approval of the franchise transfer to Lakeside Motors did not operate to prejudice First National's rights under its security agreement. If anything, considering Hamblen's character, the transfer probably worked to the bank's advantage. First National should not be heard to complain of any loss it might incur as a result of having a junior security interest.

To adopt the position urged by First National (i.e., requiring one secured creditor to look out for the interests of another) would actually be contrary to the underlying goal of Article 9, which

---

[6] Although First National and Yamaha apparently entered into a repurchase agreement, that document was not made part of the court record. Therefore, we are unable to determine the merits of First National's claim. It is reasonable to assume, though, that Yamaha would still demand full satisfaction of its outstanding loan before First National would receive any repayment. If the value of the motorcycles did not equal or exceed the sum of the two loans, First National would suffer the shortfall. In such case, it would have made no difference whether the motorcycles were sold back to Yamaha or whether a third person (here, Lakeside Motors) sold them and divided the proceeds according to the parties' priority thereto. Either way, First National would not receive a greater share of the proceeds, since its interest remained subordinate to Yamaha's.

was discussed in the Official UCC Comments to § 9101; MCL 440.9101; MSA 19.9101:

> The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and greater certainty.

The UCC accomplishes the goal, at least in part, by adopting the practice of "notice filing," Practice Comentary to § 9402, MCL 440.9402; MSA 19.9402, 23 MCLA 467-468, and by being a "pure race" statute (except under certain enumerated circumstances), see MCL 440.9312; MSA 19.9312; White & Summers, *supra,* § 25-4, p 906. A secured party should be able to rely on compliance with the UCC's requirements for perfection and not be made to take additional steps to ensure full protection. *Griffin v Continental American Life Ins Co,* 722 F2d 671, 673-674 (CA 11, 1984). If we were to impose additional responsibilities upon a secured creditor, such as requiring it to act in the best interests of all other creditors, this would increase costs and decrease certainty.

### III

The next issue before us is one which was not raised or addressed below, but which was recognized by this Court as a potential problem.[7] That

---

[7] Although we are generally loath to raise issues on our own, we have the limited power to do so in order to fulfill our function of dispensing justice. *Dearborn v Bacila,* 353 Mich App 99, 118; 90 NW2d 863 (1958); *People v Noel,* 88 Mich App 752, 754; 279 NW2d 305 (1979). This is especially true where, such as here, the issue is necessary for a proper determination of the case or is one of law concerning which the necessary facts have been presented. *Richards v Pierce,* 162 Mich 308, 316; 412 NW2d 725 (1987). The parties have presented their respective positions on this issue by way of supplemental briefs.

issue is whether the security agreement between Yamaha and Tri-City even applied to the instant transaction since it was expressly limited to sales on *credit*. Remember, Yamaha demanded, and received, certified checks (albeit bogus ones) as payment for the motorcycles. We must therefore decide what effect that has on Yamaha's claim of priority over First National in the proceeds of the motorcycles.

Whether a sale is a cash sale or a sale on credit is to be determined by the intent of the parties. *Monsanto Co v Walter E Heller & Co, Inc,* 114 Ill App 3d 1078; 449 NE2d 993; 36 UCCRS 834 (1983). Stated another way, the principal test in determining whether a transaction is governed by Article 9 is whether the parties intended the item to secure the payment or performance of an obligation. Official UCC Comment to § 9102, MCL 440.9102; MSA 19.9102; *American Triticale, Inc v Nytco Services, Inc,* 664 F2d 1136, 1145 (CA 9, 1981); *In re Parraway,* 41 UCCRS 204 (WD Mich, 1984). In the instant case, we believe that, at the time Yamaha sold the motorcycles to Tri-City, it did not intend to retain a security interest in the goods. Rather, by demanding "c.o.d.—certified funds only," it is clear that Yamaha intended to be paid in full and, in exchange, relinquished any rights to the motorcycles themselves. Its intent was not to extend credit to Tri-City, thus retaining an interest in the motorcycles to secure payment therefor. At least initially then, Yamaha's security interest arose solely under Article 2. Assuming the situation remained that way, its remedies would be limited to those provided for in the Sales Article, such as reclamation of the goods (MCL 440.2702; MSA 19.2702), or those otherwise agreed upon by the parties. See White & Summers, *supra,* § 22-10, pp 780-781. Cf., *Holiday Rambler Corp, supra,* pp

1226-1227. More importantly, its security interest would be subordinate to any perfected security interests arising under Article 9. 8 Anderson, *supra,* § 9-113:5, pp 633-634.

It is equally clear from the record, though, that sometime after the second dishonor of the checks on May 21, 1980, Yamaha abandoned its efforts to collect on those instruments and instead sought enforcement of its security agreement. At that moment, the exact time of which is unknown, we believe Yamaha's PMSI became an Article 9 security interest.[8] That being the case, its interest was subject to the Article 9 priority rules since Tri-City was in possession of the motorcycles. See Official UCC Comment 3 to § 9113, MCL 440.9113; MSA 19.9113; *Holiday Rambler Corp, supra,* pp 1226-1227; White & Summers, *supra,* § 22-10, pp 780-781.

In order for Yamaha to claim priority over First National, its security interest must have been perfected. A security interest is perfected upon the occurrence of two events. First, the interest must have "attached," i.e., when there is an agreement that certain items are to secure payment or performance of an obligation, when value is given, and when the debtor acquires rights in the collateral, MCL 440.9204(1); MSA 19.9204(1). Second, the creditor must have taken all the applicable steps for perfection. MCL 440.9303; MSA 19.9303. Under the circumstances of this case, Yamaha was required to file a financing statement with the Secretary of State's office, which it did. MCL

[8] We recognize that the parties must intend the property to serve as collateral before a security interest may arise in the property. Although Hamblen probably intended only to defraud Yamaha when he presented the forged certified checks, we will attribute the necessary intent to him. His testimony at trial, and past dealings with Yamaha, indicate his intent to grant a security interest whenever motorcycles were purchased on credit.

440.9302(1), 440.9401(1)(c); MSA 19.9302(1), 19.9401(1)(c). If a financing statement is filed prior to attachment, the security interest is perfected at the time it attaches, MCL 440.9303; MSA 19.9303 and Official UCC Comment 1 to § 9303.

Having decided that Yamaha did have a perfected security interest in the collateral sometime after May 21, 1980, we must next decide which party has priority in the proceeds of the motorcycles.[9] Although both Yamaha and First National were purchase money lenders, MCL 440.9107; MSA 19.9107, neither qualified for the special priority treatment for that type of security interest in inventory collateral (i.e., the motorcycles). MCL 440.9312(3); MSA 19.9312(3). Yamaha did not qualify because, as previously mentioned, its security interest had not attached (and, consequently, was not perfected) at the time Hamblen received the motorcycles. MCL 440.9303, 440.9312(3)(a); MSA 19.9303, 19.9312(3)(a). Similarly, First National's security interest was not perfected at the time Hamblen received possession because it did not have a financing statement properly on file with the Secretary of State's office until May 20, 1980.[10] MCL 440.9312(3)(a), 440.9401(1)(c); MSA

[9] Yamaha and First National thus possess competing PMSI's in inventory. For a good discussion of the problem in the context of competing purchase money lenders in equipment, see Johnson & Battersby, *Article Nine Dual Purchase Money Financing: Creditor Priority,* 67 Mich B J 44 (1988). Many of the principles and possible solutions discussed by the authors of that article are applicable in the instant situation.

[10] Pursuant to MCL 440.9401(2); MSA 19.9401(2), a good faith filing in an improper place is effective "with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement." Although the record indicates that Yamaha had knowledge of First National's two previous financing statements which were improperly filed, those statements asserted a security interest in the motorcycles only, not the proceeds therefrom. Hence, First National could not claim priority status in the proceeds on the basis of the earlier financing statements. The May 20, 1980, financing statement was the first notice Yamaha received regarding First National's claim to the proceeds.

19.9312(3)(a), 19.9401(1)(c). See also, *International Harvester Credit Corp v Vos,* 95 Mich App 45, 51; 290 NW2d 401 (1980), lv den 408 Mich 949 (1980).

Since neither party can take advantage of the special priority status accorded purchase money security interests, their claims to the proceeds of the motorcycles must be decided under the general priority rules, which are set forth in MCL 440.9312(6); MSA 19.9312(6):

> In all cases not governed by other rules stated in this section, including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3), (4), and (5) of this section, priority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> (a) Conflicting security interests rank according to priority in time of filing or perfection. *Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier,* provided that there is no period thereafter when there is neither filing nor perfection.
>
> (b) So long as conflicting security interests are unperfected, the first to attach has priority. [Emphasis added.]

In the case at bar, Yamaha's security interest in the motorcycles was perfected sometime after May 21, 1980. However, it first filed a financing statement covering the collateral on May 9, 1974, and notified First National of its interest on May 2, 1977. A continuation statement was filed on December 18, 1978, thus continuing its filing through the time of the instant dispute. First National, on the other hand, perfected its security interest on May 20, 1980, but had filed a financing statement, which was effective against Yamaha, on March 7,

1977.[11] Because Yamaha was the first to file a financing statement in the collateral, for which there was no lapse in filing or perfection, it has priority over First National as to the proceeds from that collateral. MCL 440.9312(6); MSA 19.9312(6) and Official UCC Comment 4 and Examples 4 and 5 to § 9312.

IV

Yamaha next claims that the trial court erred in refusing to impose a constructive trust against First National, for the benefit of Yamaha, as to the proceeds from the motorcycles. Because of our finding that Yamaha has priority in the proceeds, we agree. Where one party mistakenly retains property or money which rightfully belongs to another, a constructive trust is a proper remedial device to correct the situation. See *Reed & Noyce, Inc v Municipal Contractors, Inc,* 106 Mich App 113, 120; 308 NW2d 445 (1981), lv den 413 Mich 880 (1982); *Grasman v Jelsema,* 70 Mich App 745, 752; 246 NW2d 322 (1976). Therefore, Yamaha is entitled to a constructive trust in the proceeds to the extent of its security interest.[12]

V

Finally, Yamaha claims that the trial court

---

[11] Although the financing statement was filed in an improper place, it was effective as against Yamaha because the manufacturer was aware of its contents. MCL 440.9401(2); MSA 19.9401(2). Also, even though the earlier financial statements did not claim an interest in the proceeds—thus precluding First National from asserting special PMSI priority status therein (see, n 10)—the financing statements were sufficient for claiming the proceeds under the general priority rules. MCL 440.9312(7); MSA 19.9312(7) states that "[f]or the purposes of [MCL 440.9312(6); MSA 19.9312(6)—the general priority rules] a date of filing or perfection as to collateral is also a date of filing or perfection as to proceeds."

[12] Because of our decision as to this issue, we need not address the question whether Yamaha was entitled to the proceeds under a third-party beneficiary theory.

erred in refusing to award it exemplary damages and attorney fees. We disagree.

The courts of this state adhere to the general rule that an award of costs and attorney fees is not permitted except when expressly authorized by statute, court rule, or a recognized judicially created exception. *Warren v McLouth Steel Corp,* 111 Mich App 496, 507; 314 NW2d 666 (1981), lv den 417 Mich 941 (1982). Here, there is no such express authorization. Specifically, there is simply no evidence on record to support Yamaha's claim that the conduct of First National caused it to prosecute an action against Tri-City and James and Carol Hamblen. See *Larson v Van Horn,* 110 Mich App 369, 383-384; 313 NW2d 288 (1981). Rather, the impetus for the original litigation was the dishonor of the certified checks. That in no way can be attributed to First National.

Furthermore, the record indicates that First National had a legitimate claim to the collateral; the claim was neither frivolous nor made in bad faith. MCR 2.114(E). Again, there was no basis for an award of attorney fees.

For similar reasons, exemplary damages were also not appropriate. Generally, exemplary damages are recoverable in damage actions which are based upon tortious acts involving malice, fraud, insult, or wanton and reckless disregard of the plaintiff's rights. Such damages are compensatory, not punitive, in nature. *Rinaldi v Rinaldi,* 122 Mich App 391, 396; 333 NW2d 61 (1983). There is simply no indication from the record that First National's claim to the proceeds was motivated by other than good faith.

VI

In summary, we find that the trial court erred

in holding that Yamaha should be estopped, because of a lack of good faith and diligence, from asserting priority over First National as to the proceeds from the motorcycles. Moreover, under Article 9 general priority rules, Yamaha's security interest was superior to First National's. Yamaha is therefore entitled to a constructive trust against the bank as to the proceeds. Lastly, we can find no error in the trial court's refusal to award Yamaha attorney fees or exemplary damages.

Reversed in part; affirmed in part.[13]

---

[13] Because of our ruling in favor of Yamaha, First National's cross-claims against Tri-City and Hamblen are no longer moot, as the trial court originally found. Because First National should be given the opportunity to pursue the cross-claims if it so desires, we also remand the matter for that limited purpose. We do not retain jurisdiction, though, since the issues to be decided on remand have no bearing on the instant appeal.