PRIME FINANCIAL SERVICES LLC v VINTON

Docket No. 273264. Submitted May 13, 2008, at Grand Rapids. Decided
June 3, 2008, at 9:00 a.m.

Prime Financial Services LLC brought an action in the Kent Circuit
Court against Casey Vinton, an employee of Bedford Financial,
Inc., alleging that Vinton had discharged without authorization
several mortgages that had been assigned to Prime as security for
credit that Prime extended to Bedford for use in Bedford's
construction loan business. Prime, in turn, had secured a short-
term credit facility from Bank One, NA, to enable it to fund
Bedford. Bedford subsequently entered into a $15 million facility
directly with Bank One under which Bedford took on Prime's debt
to Bank One. This facility was secured by Bedford's mortgages and
notes—some of which had been funded solely by Prime—and the
personal guaranty of investor Richard Baidas. When Bedford
defaulted under its agreement with Bank One, Bank One accepted
a cash settlement from Baidas, in return for which Bank One
transferred to Baidas the collateral it held under its agreement
with Bedford. This collateral included 23 notes that Bedford
originated using funds provided solely by Prime. Prime's amended
complaint included claims against Bank One of conversion, unjust
enrichment, and aiding and abetting Bedford's conversions or
breaches of fiduciary duty in connection with Bank One's assign-
ment of Prime's interest in the 23 notes and mortgages to Baidas.
A jury returned a verdict against Vinton for more than $60,000
and a verdict against Bank One for an amount equal to the value
of 17 of the 23 notes at issue. The court, George S. Buth, J., entered
orders granting Prime interest and attorney fees. Bank One
appealed.

The Court of Appeals held:

1. The previous version of Article 9 of Michigan's Uniform
Commercial Code governed the creation of the security interests in
the notes at issue in this case. A note secured by a mortgage is
personal property, not real property, and prior Article 9 applied to
the creation of a security interest in instruments.

2. Bedford did not transfer ownership of the notes at issue to
Prime; rather, Bedford merely pledged the notes and mortgages at
issue as security, as indicated by the documents memorializing the

terms of the facility that Prime extended to Bedford. Bedford's agreement to indorse and deliver the notes to Prime and to assign the mortgages underlying the notes to Prime are merely the steps that Bedford agreed to take to ensure that Prime's security interest in the collateral was fully protected.

3. Prime's security interest in the notes was unperfected because Bedford retained possession of the notes during all relevant periods. Under prior Article 9, a secured party could perfect its interest in instruments only by taking and retaining possession of them. Although a secured party could take possession through an agent, the debtor or a person controlled by the debtor could not qualify as an agent for the secured party for this purpose because the debtor's possession would establish an opportunity for fraud. Accordingly, Bedford could not possess the notes on Prime's behalf.

4. Bedford's assignment of the mortgages did not alter the nature of Prime's unperfected security interest in the notes underlying them. Under Michigan real property law, a secured party cannot obtain a greater security interest in a mortgage than it has in the note underlying the mortgage by recording an assignment of mortgage incident to a secured transaction. Because prior Article 9 governed Prime's security interest in the notes at issue, Bedford's assignment of the mortgages to Prime had no legal effect on Prime's security interest in the corresponding notes, and a mortgage without an underlying obligation is a nullity. Although there were valid notes underlying the mortgages at issue, Bedford did not transfer ownership of those notes to Prime, and Prime did not otherwise obtain ownership of the notes. Instead, Bank One took ownership of the notes by asserting its right to dispose of them after Bedford's default, and the underlying mortgages transferred to Bank One by operation of law.

5. Although Prime's security interest preceded Bank One's interest, Bank One's interest was superior because Prime's interest was unperfected. Under the plain, unambiguous terms of the pledge from Bedford to Bank One, Bank One was to take a security interest in any note and mortgage delivered under the pledge, and Bank One asked Bedford to bring all its notes and mortgages, which included those at issue, to the closing to secure the funds that Bank One advanced. By entering into the agreements and bringing the notes to the closing, Bedford gave Bank One a perfected security interest in the notes at issue. The fact that Bedford had already granted a security interest in these notes to Prime and agreed not to further pledge them as security did not defeat Bedford's ability to grant a security interest in them to Bank One.

6. Bank One's dispositions of the notes and mortgages were specifically authorized under prior Article 9, which gave Bank One's interest in the notes priority over Prime's interest, and therefore could not have constituted conversion or unjust enrichment. Further, Bank One cannot be liable for aiding and abetting conversion or for breach of fiduciary duty in connection with Bedford's grant of a security interest to Bank One because Bedford owned the notes at issue and did not owe Prime a fiduciary duty. Accordingly, the trial court should have granted Bank One's motion for judgment notwithstanding the verdict on these claims.

Reversed and remanded for entry of judgment in favor of Bank One.

SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — NOTES SECURED BY MORTGAGES.

An interest in a note secured by a mortgage constitutes an interest in personal property, not real property, under the version of Article 9 of Michigan's Uniform Commercial Code in effect before July 1, 2001 (MCL 440.9101 *et seq.*).

*Drew, Cooper & Anding* (by *John E. Anding, Bridget C. Kehoe,* and *Thomas V. Hubbard*) for Prime Financial Services LLC.

*Dickinson Wright PLLC* (by *Jeffery V. Stuckey, Rock A. Wood, Geoffrey A. Fields,* and *Erin E. Gravelyn*) for Bank One, NA.

Before: O'CONNELL, P.J., and HOEKSTRA and SMOLENSKI, JJ.

SMOLENSKI, J. In this collateral dispute involving priority to notes secured by mortgages, defendant Bank One, NA (Bank One),[1] appeals as of right the jury

---

[1] Bank One, NA, is the successor to Bank One, Michigan, which in turn was the successor to NBD. After Prime sued Casey Vinton, Bank One, NA, merged with JPMorgan Chase Bank, NA. However, for ease of reference, we will use "Bank One" or "bank" throughout this opinion to refer to the various incarnations of the bank involved in the dealings at issue.

verdict in favor of plaintiff Prime Financial Services
LLC (Prime) premised on conversion, unjust enrich-
ment, aiding and abetting conversion, and aiding and
abetting breach of fiduciary duty. On appeal, the pri-
mary issues are whether prior Article 9 of the Uniform
Commercial Code (UCC)[2] governed the creation of a
security interest in a note secured by a mortgage and, if
it did, whether a properly recorded assignment of
mortgage could give the assignee greater rights to the
note than the assignee had under Article 9. We conclude
that Article 9 governed the creation of the security
interests at issue and that an assignment of mortgage
can give no greater rights to the assignee than it has in
the note underlying the mortgage. We further conclude
that, after applying Article 9 to the undisputed facts of
this case, Bank One's interest in the notes was superior
to that of Prime. Finally, because Bank One's disposi-
tions of the notes and mortgages were specifically
authorized under Article 9, we conclude that those
actions cannot—as a matter of law—constitute conver-
sion, unjust enrichment, or aiding and abetting conver-
sion or breach of fiduciary duty. Accordingly, we reverse
the trial court's decision to deny Bank One's motion for
judgment notwithstanding the verdict (JNOV) and re-
mand for entry of judgment in favor of Bank One on all
of Prime's claims.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises out of the failure of Bedford Finan-
cial, Inc. (Bedford), which did business under the name

---

[2] Throughout this opinion we cite both the current revised version and
the prior version of Article 9. In order to distinguish between the
applicable versions, we will cite the current version with the year that it
became effective (2001). Citations without the year refer to the prior
version of Article 9. All citations to other articles of the UCC are to the
current version.

of Apex Financial. Bedford was in the business of making short-term subprime loans to consumers to cover the cost of constructing modular homes. In a typical transaction, a consumer would arrange to finance the purchase and construction of a modular home through Bedford. The consumer would execute a note for the balance of the construction loan and grant Bedford a mortgage on the real property to secure repayment of the note. Once the home was complete, the consumer would obtain permanent financing—referred to as a "takeout loan" or "end-mortgage"—and pay off the loan from Bedford. Under ideal circumstances, the consumer would pay off the construction loan with Bedford in 60 to 90 days.

Because Bedford did not have the cash reserves to fund its lending activities, it had to secure funding from outside sources.[3] Patrick Hundley, who was the owner of Bedford, initially obtained funding for Bedford through First of America Bank. At some point before December 1997, Hundley's loan officer from First of America approached Arthur Bott, who was a business owner and investor, about funding Bedford's business. Bott began to fund Bedford's loan activities through his trust, which eventually became Bedford's primary source of funds. Bott was attracted to Bedford by the 15 percent rate of return on the loans.

In the summer of 1997, Bott organized Prime with Hundley. Sometime thereafter, Bank One[4] approached Bott about assisting him with his business activities,

---

[3] Such lenders are often referred to as "warehouse lenders." See *Regions Bank v Provident Bank, Inc*, 345 F3d 1267, 1270 (CA 11, 2003) (describing a typical warehouse lending arrangement); *Provident Bank v Community Home Mortgage Corp*, 498 F Supp 2d 558, 561 n 2 (ED NY, 2007) (defining warehouse lending).

[4] At the time, the actual bank was NBD.

and Bott suggested that the bank help him fund Bedford. Bott testified that he and Hundley agreed that Bott would take over Prime after talks with Bank One began. Eventually, Bott's trust became the sole member of Prime, with Bott as the sole officer. After the formation of Prime, Bott began to fund Bedford through Prime, but also continued to provide some funding through his trust.

In November 1997, Bank One agreed to provide a "short-term construction loan facility" to Prime in the amount of $5 million. Under the terms of the facility, the bank would fund 72 percent of the lesser of the cost or appraised value of the project. Apparently Prime was supposed to fund an additional eight percent, and the remaining 20 percent represented the consumer's equity. The loan payments were interest-only until the consumer obtained end-mortgage financing. Once the consumer obtained an end-mortgage and paid Prime through Bedford, Prime was required to pay Bank One the principal associated with that particular consumer's loan. However, the facility also provided that, if the consumer did not obtain an end-mortgage within nine months of the initial advance, Prime had to pay the principal associated with that particular consumer's loan. As part of the facility, Bott gave his personal guaranty and that of his trust to Bank One. Prime closed on the facility with Bank One on January 9, 1998.

Prime entered into a $10 million credit facility with Bedford on January 28, 1998. This facility was similar to the credit facility between Prime and Bank One. Under this facility, Prime took a security interest in all the loans originated by Bedford with funds supplied by Prime, required payment of the principal associated with a given loan when the consumer obtained end-

financing, and, if the consumer did not obtain an end-mortgage within nine months of the initial disbursement, required Bedford to repay the principal associated with that particular project. Likewise, under the terms of the agreement, Bedford granted a security interest in the notes, which it was required to deliver to Prime along with the corresponding mortgages. In addition, Bedford was required to assign the mortgages to Prime. Despite the delivery requirement, Prime permitted Bedford to retain the notes in its possession.

After these agreements, Prime funded some loans originated by Bedford jointly with its own funds and funds drawn on its facility with Bank One. In the case of the jointly funded loans, Prime funded more than the contemplated eight percent. In other cases, Prime funded the loans entirely without drawing on the credit facility with Bank One.

At some point after Bank One entered into the facility with Prime, Bott apparently received information that there were concerns with Bedford's loan practices. Bott's attorney wrote a letter to Hundley expressing concern over his "cavalier" attitude toward the loans and "lack of documentation." Bott also had problems with another bank related to his interests in Bedford loans. Some time in March 1999, Bott told Hundley to find another lender "besides me[;] I would like out." In the past, Hundley had had dealings with Richard Baidas, who owned several businesses, including one that manufactured modular homes. Baidas expressed interest in purchasing an interest in Bedford.

In June 1999, Bank One entered into a new $15 million facility agreement with Bedford. Under this new facility, Bank One would directly fund Bedford's lending. As part of the deal, Bank One would pay off the

amount currently owed by Prime to Bank One under the $5 million facility between Prime and Bank One. This effectively transferred the debt from Prime to Bedford and relieved Bott and his trust of their liability under their guaranties. This new facility was made possible in part by the personal guaranty of Baidas.

Under the terms of the $15 million facility, Bedford granted Bank One a security interest in certain property "now owned, or at any time hereafter acquired," including "all Mortgage Notes and Mortgages . . . which from time to time are delivered, or caused to be delivered, to the Bank . . . pursuant hereto or in respect of which an extension of credit has been made by the Bank under the Credit Agreement." Bank One instructed Bedford to bring all its notes and mortgages to the closing, which included some notes that were funded solely by Prime. In addition, Bank One had Bedford obtain UCC termination statements from several lenders, including Prime. These termination statements purported to terminate the respective lenders' security interests in Bedford's instruments. However, at trial, Bott testified that he signed the UCC termination statement in blank with the understanding that it only terminated his security interest in those notes and mortgages that were jointly funded using funds from Prime and Bank One, as opposed to those notes and mortgages funded solely by Prime.

By spring 2000, Bedford was no longer sending principal payments to Bank One. Indeed, Bank One became aware that Bedford had conducted end-mortgage closings and discharged many of the notes and mortgages securing its facility with Bedford. As a result, Bank One's loan to Bedford was seriously under-collateralized. In addition, Bank One learned that Bedford had ceased operations and was liquidating its

assets in violation of the credit agreement. For these reasons, in May 2000, Bank One informed Bedford by letter that it considered Bedford to be in default on the $15 million facility.

After Bedford defaulted, Bank One examined its exposure and, rather than try to liquidate Bedford's assets, it decided to call on the guaranty of Baidas. The bank determined that the total debt owed was approximately $6.5 million. After some negotiations, Bank One settled with Baidas in June 2000. The bank accepted payment of approximately $5.5 million in full settlement of Baidas's guaranty. As part of the settlement, Bank One agreed to transfer the collateral it held under its agreement with Bedford to Baidas. This collateral included 23 notes that were originated by Bedford using funds provided solely by Prime.

In addition to the millions of dollars that Bedford owed Bank One, Bedford owed Prime almost $1.7 million. In May 2001, Prime settled this debt with Bedford and Hundley, who had personally guaranteed the loan with his wife, for $825,000. Although Prime released Hundley and his wife from their guaranties, Prime did not receive any of the settlement. Instead, the agreement provided that Hundley would apply the $825,000 to reduce debts owed to the Bott trust.

In October 2001, Prime sued Casey Vinton for conversion. In its complaint, Prime alleged that Vinton, who was an employee of Bedford, had discharged several mortgages that had been assigned to Prime. Prime alleged that Vinton had signed the discharges as an "officer of Prime," but had never been an officer and was not authorized by Prime to discharge the mortgages.

In May 2002, Prime amended its complaint to include claims against Bank One. In the amended complaint,

Prime alleged that Bank One converted the "Edwards" check and converted or mishandled other checks that were payable to Prime but deposited into Bedford's account. Prime later filed a second amended complaint, which alleged additional counts claiming that Bank One converted the proceeds of certain loans in which Prime had a superior interest to Bank One. Prime amended its complaint for a third time in March 2004.

In the third amended complaint, Prime alleged 10 counts against Bank One. Prime alleged that Bank One (1) converted Prime's interest in notes and mortgages by assigning them to Baidas, (2) was unjustly enriched when it "conveyed" to Baidas loans that were originated by Bedford with money from Prime, (3) was unjustly enriched when it assigned to Baidas numerous loans that were jointly funded by Prime and Bank One, (4) aided and abetted Bedford's breach of fiduciary duty or conversion of loans funded solely by Prime, (5) aided and abetted Bedford's breach of fiduciary duty or conversion of loans funded jointly by Prime and Bank One, (6) converted the "Edwards" check, (7) converted other checks payable to Prime, (8) negligently mishandled the "Edwards" check, and (9) mishandled other checks. In addition to these counts, Prime asked the court to impose a constructive trust to the extent that Bank One received the proceeds of loans to which Prime had a superior interest.

Prime's complaint eventually proceeded to trial. The trial court submitted five claims against Bank One to the jury: (1) conversion, (2) unjust enrichment, (3) aiding and abetting conversion, (4) aiding and abetting breach of fiduciary duty, and (5) conversion of the "Edwards" check. The first four claims were all related to the 23 notes and mortgages originated by Bedford using funds from Prime and eventually turned over to

Bank One as collateral for the $15 million facility. The jury ultimately returned a verdict in favor of Prime against Bank One in the amount of $1,180,358.16.[5] As the parties agree, this amount appears to be the face amount of the 23 notes at issue minus the value of five notes for which Prime admitted that Bedford never assigned the mortgage and minus the value of one other note that the proofs demonstrated had been paid before Bank One received any notes as collateral. Hence, the verdict represented the face value of 17 of the 23 notes at issue during trial; the verdict did not include the value of the "Edwards" check. After the judgment in favor of Prime against Bank One, the trial court entered several orders, including orders granting Prime interest and awarding attorney fees to Prime in the amount of $269,716.74.

This appeal followed.

## II. JUDGMENT NOTWITHSTANDING THE VERDICT

Because we find it dispositive of this appeal, we shall first address Bank One's argument that the trial court should have granted Bank One's motion for JNOV.

### A. STANDARD OF REVIEW FOR JNOV

This Court reviews de novo a trial court's denial of a motion for JNOV. *Reed v Yackell*, 473 Mich 520, 528; 703 NW2d 1 (2005). In determining the propriety of the trial court's decision, we review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998). "Only if the evidence, when

---

[5] The jury also returned a verdict against Vinton in an amount in excess of $60,000. However, that judgment is not at issue on appeal.

viewed in this light, fails to establish a claim as a matter of law should a motion for . . . JNOV be granted." *Reed*, *supra* at 528.

### B. THE PARTIES' INTERESTS IN THE NOTES AND MORTGAGES

In order to determine whether Bank One's actions with regard to the notes and mortgages can support Prime's claims, one must first determine the nature and extent of the interests that the parties held in the notes and mortgages at issue.

### 1. BEDFORD'S INTERESTS IN THE NOTES AND MORTGAGES

It is undisputed that Bedford originated all the notes and mortgages at issue. As part of its financing activities, Bedford lent money to consumers to assist them in purchasing and constructing modular homes on real property. In exchange for this financing, the consumers executed a promissory note by which they agreed to pay Bedford the principal plus interest and fees. In addition, to secure the payment of the note, the consumers created a mortgage in favor of Bedford.

Under Michigan law, a mortgage is not an estate in land, *Foote v City of Pontiac*, 161 Mich App 60, 65; 409 NW2d 756 (1987), citing *Plasger v Leonard*, 312 Mich 561, 564; 20 NW2d 296 (1945); it is a lien on real property intended to secure performance or payment of an obligation. *McKeighan v Citizens Commercial & Savings Bank of Flint*, 302 Mich 666, 670; 5 NW2d 524 (1942). But, although a mortgage is a contingent interest in real property, a note secured by a mortgage is itself personal property. *Union Guardian Trust Co v Nichols*, 311 Mich 107, 115; 18 NW2d 383 (1945). And the owner of a note secured by a mortgage may transfer the note to third parties. See *Ginsberg v Capitol City*

*Wrecking Co*, 300 Mich 712, 717; 2 NW2d 892 (1942), citing *Ladue v Detroit & M R Co*, 13 Mich 380 (1865). Consequently, after the individual consumers executed the notes and mortgages at issue in favor of Bedford, Bedford owned those notes as personal property, which it could in turn transfer or pledge to third parties.

However, Bedford could not transfer the mortgages separately from the underlying notes. A mortgage is a mere security interest incident to an underlying obligation, and the transfer of a note necessarily includes a transfer of the mortgage with it. *Ginsberg, supra* at 717. For the same reason, a transfer of a mortgage without the underlying obligation "is a mere nullity." *Id.*; see also *Cummings v Continental Tool Corp*, 371 Mich 177, 183; 123 NW2d 165 (1963) (noting that a mortgage without an underlying enforceable obligation fails as a matter of law). Thus, the interests held by Prime and Bank One must be ascertained by determining whether and to what extent Bedford granted an interest in the notes to Prime and Bank One.

### 2. PRIME'S INTEREST IN THE NOTES AND MORTGAGES

#### a. PRIOR ARTICLE 9 OF THE UCC APPLIED TO THE CREATION OF THE SECURITY INTERESTS IN THE NOTES AT ISSUE

On appeal, the parties dispute whether Article 9 of Michigan's Uniform Commercial Code applied to the interests at issue. Bank One contends that Article 9 clearly applied and is dispositive of the entire case. In contrast, Prime argues that Article 9 of the UCC did not apply because an interest in a note secured by a mortgage constitutes an interest in real property. Therefore, we shall first address whether and to what extent Article 9 of the UCC applied to the interests at issue.

We note that the actions taken by Bank One, which Prime alleges to have been unlawful, all occurred before the enactment of the current version of Article 9, which became effective on July 1, 2001. See 2000 PA 348. Although the current version of Article 9 generally applies to actions commenced after its effective date, even when the liens at issue were created before the effective date, see MCL 440.9702(1) and (3) (2001); but cf. *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 17; 718 NW2d 827 (2006) (concluding, without analyzing MCL 440.9702 [2001], that § 5 of prior Article 9 governed the default at issue because the agreements and actions at issue were made before 2001—even though the plaintiff did not sue until after 2001), because Prime's claims are common-law claims premised on the propriety of Bank One's actions under the prior version of Article 9, we conclude that Bank One's actions must be analyzed in light of its rights and duties under the prior act. Furthermore, where the relative priorities of parties were established before the effective date of revised Article 9, the article "as in effect before this amendatory act takes effect determines priority." MCL 440.9709(1) (2001). Hence, to the extent that prior Article 9 applied and established the respective priorities of the parties in the notes at issue, that priority governs the parties' security interests.

Prior Article 9 applied to "any transaction (regardless of its form) which is intended to create a security interest in *personal property* or fixtures . . . ." MCL 440.9102(1)(a) (emphasis added); cf. MCL 440.9109(1)(a) (2001); see also *Shurlow v Bonthuis*, 456 Mich 730, 735; 576 NW2d 159 (1998) (noting that Article 9 provides a "comprehensive scheme" of regulation that governs "[a]ll transactions intended to create a security interest in personal property and fixtures"). Furthermore, MCL 440.9104(j) provided that prior Article 9 did not apply "to the creation or transfer of an interest in or lien on real estate . . . ."

Hence, to the extent that the transactions at issue purported to create or transfer a lien on *real property*, prior Article 9 did not apply to the transaction. See *In re Moukalled Estate*, 269 Mich App 708, 715-719; 714 NW2d 400 (2006) (holding that prior Article 9 did not apply to the creation of a security interest in a land contract vendee's interest in real estate); cf. MCL 440.9109(4)(k) (2001).

However, even before the enactment of Michigan's UCC, our Supreme Court determined that a note secured by a mortgage is *personal property*. *Union Guardian Trust Co, supra* at 115. Furthermore, by its plain terms, prior Article 9 applied to the creation of a security interest in instruments. See MCL 440.9102(1)(a). An instrument means "a negotiable instrument as defined in [MCL 440.3104] or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." MCL 440.9105(1)(i); cf. MCL 440.9102(1)(uu) (2001). Further, "[t]he application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply." MCL 440.9102(3); cf. MCL 440.9109(2) (2001). A comment to prior Article 9 illustrated application of this rule:

> The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage. This Article leaves to

other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or non-recording of an assignment of the mortgagee's interest. [MCL 440.9102, comment 4.][6]

In the present case, Bedford originated the loans and obtained a security interest—a mortgage—in the consumer's real property. Because the mortgage created a lien on real property, prior Article 9 did not apply to the creation of that interest. MCL 440.9104(j). However, the transactions between Bedford and Prime did not create a new lien or transfer or create an interest in property. Instead, the transactions involved the pledge of existing notes, which were secured by existing mortgages. And by its plain terms, prior Article 9 applied to the creation of a security interest in those notes—even though the notes were secured by mortgages. MCL 440.9102(3). Consequently, prior Article 9 clearly applied to the creation of the security interests in the notes at issue. See *In re SGE Mortgage Funding Corp*, 278 BR 653, 657-659 (Bankr MD Ga, 2001) (holding that prior Article 9 applied to the creation of security interests in notes secured by mortgages and listing authorities holding the same); see also *In re Atlantic Mortgage Corp*, 69 BR 321, 324 (Bankr ED Mich, 1987) (interpreting Michigan's prior Article 9 to require courts to separately analyze a secured party's interest in the note under the UCC and in the mortgage under real property law).

---

[6] Each comment cited in this opinion is the official comment prepared by the National Conference of Commissioners on Uniform State Laws and the American Law Institute for the section of the prior or revised version of Article 9 that corresponds to the Michigan UCC section cited. Although the official comments do not have the force of law, they are useful aids to interpretation and construction of the UCC. Further, the comments were intended to promote uniformity in the interpretation of the UCC. Therefore, it is appropriate for this Court to consider the official comments when interpreting Michigan's UCC. See *Yamaha Motor Corp, USA v Tri-City Motors & Sports, Inc*, 171 Mich App 260, 271; 429 NW2d 871 (1988).

b. PRIME HAD A SECURITY INTEREST IN THE NOTES
RATHER THAN AN OWNERSHIP INTEREST

In its pleadings before the trial court and at trial, Prime's counsel often used imprecise language when referring to the loans and mortgages at issue and suggested that Prime actually owned the notes at issue. Further, at oral argument Prime's counsel continued to assert that Prime had an ownership interest in the notes at issue by virtue of its security interest. Hence, we will next address whether Bedford actually transferred ownership of the notes at issue to Prime or whether Bedford merely pledged the notes and mortgages at issue as security.[7]

The intent of the parties to an agreement concerning an interest in property determines whether the agreement transfers ownership of the property or whether the parties merely intended the property to secure performance of an obligation. MCL 440.9102(1)(a); *Yamaha Motor Corp, USA v Tri-City Motors and Sports, Inc*, 171 Mich App 260, 276; 429 NW2d 871 (1988); *Shurlow, supra* at 735 ("[T]he determinative factor is not the form of the transaction as much as it is the intent of the parties in entering into the transaction."). The parties' intent can best be discerned by examining the language actually used in the governing agreement. *Rory v Continental Ins Co*, 473 Mich 457, 469 n 21; 703 NW2d 23 (2005). If an agreement is unambiguous, its provisions are a matter of law for the court. See *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003) ("[A]n unambigu-

---

[7] Prior Article 9 did not apply to a true sale of notes as opposed to a transfer intended merely to provide security. See MCL 440.9102, comments 1 and 4. In addition, if Bedford no longer had any interest in the notes by reason of sale to Prime, Bedford could not have granted a security interest in the notes to Bank One. See MCL 440.9203(1)(c).

ous contractual provision is reflective of the parties' intent as a matter of law.").

In January 1998, Prime agreed to extend a $10 million facility to Bedford in order to help Bedford originate loans for the purchase and construction of modular homes. Several documents memorialized the terms of the facility. And when these documents are read as a whole, it is clear that the parties unambiguously agreed that Prime would have only a security interest in the notes and mortgages funded by Prime.

In the credit agreement, the parties defined the term "mortgage" to mean "a security agreement or other similar security device or arrangement from a Mortgagor to [Bedford] creating a valid first mortgage lien on a Project" and defined "mortgage note" to mean "a mortgage note or other evidence of indebtedness from a Mortgagor to [Bedford], evidencing Mortgagor's obligation to make repayment of a Construction Loan . . . ." The parties also defined the term "collateral" to mean "the collateral . . . described in the Pledge and Security Agreement . . . and such other collateral as shall be given from time to time to secure the Indebtedness, including . . . the Mortgages and Mortgage Notes relating to Projects." The credit agreement also required Bedford to execute a UCC-1 financing statement "granting a valid first position security interest in the Collateral." Moreover, in addition to other required documentation, Bedford agreed to obtain an original note and mortgage from the consumer and deliver the mortgage to Prime before it obtained an advance from Prime to fund the note.

In the "Pledge and Security Agreement," Bedford granted Prime a security interest in collateral, which included "[a]ll instruments now owned and hereafter acquired by [Bedford], including but not limited to all

mortgage notes . . . together with all other related documents, including but not limited to mortgages, security agreements or other similar security devices or arrangements securing such mortgage notes . . . which instruments are financed with the proceeds of loans from [Prime] to [Bedford] . . . ." Bedford also warranted that the notes were properly endorsed and assigned to Prime, as required by the credit agreement, and that the mortgages securing the notes were valid first liens that were duly recorded. Bedford also warranted that the assignments of the mortgages in favor of Prime were properly recorded with the office of the county in which the real estate was located. Finally, Bedford agreed to protect the collateral, to not encumber or transfer the collateral to third parties, and to "deliver physical possession of any Instrument, including . . . any Mortgage Note and . . . mortgage, to [Prime] or an agent of [Prime]."

These agreements, when read together, unambiguously provide that Bedford granted a security interest to Prime in the notes and mortgages that it originated with funds drawn on the facility with Prime. Bedford's agreement to indorse and deliver the notes to Prime and to assign the mortgages underlying the notes to Prime are merely the steps that Bedford agreed to take to ensure that Prime's security interest in the collateral was fully protected. Hence, the assignment of the mortgages by Bedford did not, as a matter of law, effect a transfer in the ownership of the notes and mortgages from Bedford to Prime. *Quality Products & Concepts Co, supra* at 375; *Yamaha Corp, supra* at 276.

### c. PRIME'S SECURITY INTEREST IN THE NOTES WAS UNPERFECTED UNDER PRIOR ARTICLE 9

Under prior Article 9, in relevant part, a security interest is not enforceable against the debtor or third

parties with respect to the collateral unless (1) the secured party has obtained possession of the collateral under an agreement or the debtor has signed a security agreement that describes the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. MCL 440.9203(1). The security interest attaches "when it becomes enforceable against the debtor with respect to the collateral." MCL 440.9203(2). Under the agreements in the facility between Prime and Bedford, Prime had an enforceable security interest in the notes and mortgages originated by Bedford using funds drawn on the facility. Although Prime had a security interest in the notes and mortgages, until Prime perfected its security interest in the notes and mortgages, Prime's rights were subordinate to the rights of certain third parties. See MCL 440.9301(1).

Under prior Article 9, a security interest typically became perfected when the secured party filed a UCC-1 financing statement covering the collateral to which the security interest attached. MCL 440.9302(1). However, under prior Article 9, a secured party could perfect its interest in instruments only by taking possession of the instruments. MCL 440.9304(1).[8] And the perfected status remained only as long as the secured party retained possession. MCL 440.9305. Although a secured party could take possession through an agent, "the debtor or a person controlled by him cannot qualify as such an agent for the secured party." MCL 440.9305, comment 2; cf. MCL 440.9313 (2001), comment 3 (stating that the "debtor cannot qualify as an agent for the secured party for purposes of the secured party's taking possession").[9]

---

[8] But a secured party's interest was automatically perfected for 21 days after the security interest attached to an instrument. See MCL 440.9304(4).

[9] Under revised Article 9, a secured party can perfect its security interest in instruments either by filing or by taking possession. MCL

On appeal, Prime contends that comment 2 to MCL 440.9305 does not accurately reflect the law. However, the majority of courts that have examined the issue have rejected the notion that a secured party can perfect its security interest by designating the debtor as its agent. See, e.g., *Edibles Corp v West Ontario Street Ltd Partnership*, 273 Ill App 3d 550; 653 NE2d 45 (1995); *In re Rolain*, 823 F2d 198 (CA 8, 1987); *In re Atlantic Mortgage Corp, supra* at 331; *Heinicke Instruments Co v Republic Corp*, 543 F2d 700 (CA 9, 1976); *In re Copeland*, 531 F2d 1195 (CA 3, 1976); see also 1A-6A Worley & McDonnell, Secured Transactions Under the UCC, § 6A.04 (noting that there are "important limitations to the general principle of possession-by-agency" and stating that the "most important of these limitations is that the secured party cannot perfect its security interest by designating as its agent the debtor or someone closely associated with the debtor"). A debtor cannot qualify as the agent for a secured party for purposes of taking possession of collateral because the continued possession by the debtor establishes the opportunity for fraud:

> The point of requiring possession of collateral in the secured party is to provide notice to prospective third party creditors that the pledgor no longer has unfettered use of the collateral. (See *Ingersoll-Rand Financial Corporation v. Nunley* (4th Cir. 1982), 671 F.2d 842, 844-45.). Although never defined, "possession" is used in article 9 to establish a filing scheme and allow perfection by means other than filing, such as possession in the third party. Under pre-code law, a security interest was invalid if the debtor retained control of the collateral. That control could perpetrate fraud on potential creditors who, unaware of another

440.9312(1) (2001); MCL 440.9313(1) (2001). Thus, under revised Article 9, Prime could have allowed Bedford to retain the notes without jeopardizing its perfected status by filing a financing statement. See also MCL 440.9312 (2001), comment 2.

creditor's security interest, would assume the collateral belonged to the debtor. See *Benedict v. Ratner*, 268 U.S. 353, 45 S. Ct. 566, 69 L. Ed. 991 (1925). [*Edibles Corp*, *supra* at 554.]

Further, although Prime and Bedford could have varied the provisions of the UCC by agreement, see MCL 440.1102(3), the "meaning of the statute itself . . . cannot be varied by agreement." MCL 440.1102, comment 2; see also *Becker v Nat'l Bank and Trust Co*, 222 Va 716, 719-721; 284 SE2d 793 (1981) (noting that parties are not able to vary the concepts and definitions of the UCC by agreement and, therefore, the parties before the court could not agree to permit an assignee to negotiate notes because that would necessarily alter the meaning of the terms "holder," "due negotiation," and "holder in due course"). Hence, the meaning of "possession" for purposes of perfection under prior Article 9 must be understood in light of comment 2 and cannot be varied by the agreement of the parties. MCL 440.1102, comment 2.

In addition, the rights of third parties under Article 9 cannot be "destroyed by a clause in the security agreement." MCL 440.1102, comment 2. Because the provisions governing the manner in which a secured party obtains a perfected security interest in collateral directly affects the rights of third parties in the same collateral, the parties to a security agreement cannot vary the manner in which the secured party may obtain perfection of its security interest through possession; the secured party must have and retain possession consistent with the requirements of MCL 440.9305, as explained in comment 2. For these reasons, we reject Prime's contention that it could designate Bedford as its agent for purposes of possessing the notes.

In the present case, notwithstanding the requirements of the credit and security agreements, it is

undisputed that Bedford retained possession of the notes at issue during all relevant periods. And Bedford could not possess the notes at issue on Prime's behalf. MCL 440.9305, comment 2. Consequently, under prior Article 9, Prime only had an unperfected security interest in the notes.

### d. BEDFORD'S ASSIGNMENT OF THE MORTGAGES DID NOT ALTER THE NATURE OF PRIME'S UNPERFECTED SECURITY INTEREST IN THE NOTES

On appeal, Prime contends that the recorded assignments of the original mortgages gave it a perfected security interest that was superior to that of Bank One. We do not agree.

First, it must be reiterated that, under the plain language of the agreements governing the relationship between Bedford and Prime, the assignment of the mortgages at issue did not effect a transfer in ownership from Bedford to Prime. Hence, this is not a case where the parties intended to evidence a transfer of ownership of the note and mortgage through the recording of an assignment of the mortgage. See *In re SGE Mortgage Funding Corp*, *supra* at 662 (noting that the assignments at issue did not transfer an interest in land). Rather, because the parties only intended Prime to have a security interest in the notes and mortgages, prior Article 9 clearly governed the security interest in the notes.[10] See MCL 440.9102(1)(a) and (3). Nevertheless, courts have struggled with the effect, if any, that real estate law has on the perfection of a security interest under prior Article 9 in a note that was itself

---

[10] We note that, unlike prior Article 9, revised Article 9 applies to the sale of notes. However, under revised Article 9, a purchaser automatically obtains a perfected security interest when the security interest attaches, see MCL 440.9309(d) (2001); there is no need to file a financing statement or take possession of the note.

secured by a mortgage. See 1C-16 McDonnell, Secured Transactions Under the UCC, § 16.09 (examining how courts have handled the problem of perfecting an instrument secured by a mortgage); see also *In re SGE Mortgage Funding Corp, supra* at 659-662.

As already noted, prior Article 9 encompassed the creation of a security interest in an instrument, even if that instrument was itself secured by an underlying mortgage. See MCL 440.9102, comment 4. However, comment 4 also left "to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or non-recording of an assignment of the mortgagee's interest." *Id.* This commentary has led some courts to use a bifurcated approach in determining a secured party's interest in a note and mortgage. See *In re Maryville Loan & Savings Corp*, 743 F2d 413 (CA 6, 1984), clarified on reconsideration 760 F2d 119 (CA 6, 1985); *In re Atlantic Mortgage Corp, supra* at 324 (relying on *In re Maryville* for the proposition that Michigan's UCC must be read to require a bifurcated approach); *Provident Bank v Community Home Mortgage Corp*, 498 F Supp 2d 558, 565 (ED NY, 2007). Under the bifurcated approach, prior Article 9 would govern priorities in the note, but real property law would govern priorities in the mortgage. *In re Maryville, supra* at 415-417. Hence, where two parties have a security interest in a single note, which is secured by a mortgage, one party could have priority in the note under prior Article 9 and the other could have priority in the mortgage under real property law.

But other courts have recognized that separately analyzing the perfected status of the note and mortgage is simply inconsistent with the basic principle that the note controls the mortgage. In their view, this inconsistency means that Comment 4 must be either ignored or limited in

> its application to contexts other than determination of the perfection of the assignee's interest. In this view, the creditor gains a perfected security interest in the note and mortgage and their proceeds so long as it is perfected as to the note, and it is not necessary to consult real estate law to determine whether the creditor's interest in the mortgage is perfected. [1C-16 McDonnell, Secured Transactions Under the UCC, § 16.09(2)(c).]

We reject the notion that, under Michigan real property law, by recording an assignment of mortgage incident to a secured transaction, a secured party can obtain a greater security interest in a mortgage than it has in the note underlying the mortgage. This can best be illustrated by applying Michigan's real property law to the facts of this case.

Prior Article 9 governed Prime's security interest in the notes at issue. MCL 440.9102(1)(a) and (3). Hence, Bedford's assignment of the mortgages to Prime had no legal effect on Prime's security interest in the corresponding notes. And as already noted, a mortgage without an underlying obligation is a nullity. *Ginsberg*, *supra* at 717. Although Prime correctly observes that there were valid notes underlying these mortgages, Bedford did not transfer ownership of those notes to Prime. For that reason, the effectiveness of the assignments to Prime—if they had any legal effect at all—was contingent on Prime's obtaining ownership of the notes. *Id.* But Prime never obtained ownership of the notes. Instead, Bank One asserted its right to dispose of the notes after Bedford's default. See MCL 440.9504(1); cf. MCL 440.9610(1) (2001). When Bank One asserted this right, it took ownership of the notes, the underlying mortgages transferred to Bank One by operation of law, and the assignments to Prime of the mortgages securing these notes became nullities. *Ginsberg*, *supra* at 717. Hence, under Michigan's real property law—the

"other law" of comment 4 to MCL 440.9102—the assignment of a mortgage securing a note as part of a secured transaction does not give the assignee any greater rights to the note than the assignee would have had under prior Article 9. And, because the mortgage follows the note, *Ginsberg, supra* at 717, the assignee of a mortgage cannot have a greater security interest in the mortgage than it has in the underlying note. Cf. *In re Atlantic Mortgage Corp, supra* at 325 (interpreting Michigan's prior Article 9 and real property law and concluding that, "if an investor's interest in the underlying debt is subordinate to the trustee's, the investor's superior interest in the mortgage does not give the investor any right to collect the debt," and, consequently, "an investor without possession of the underlying note retains no rights incident to either the note or the mortgage").

We note that this approach is consistent with the approach adopted by Michigan's Legislature with the enactment of revised Article 9. Revised Article 9 explicitly provides that the "attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien," MCL 440.9203(7) (2001), and "[p]erfection of a security interest in collateral also perfects a security interest in a supporting obligation for the collateral," MCL 440.9308(4) (2001). Further, although revised Article 9 continues to provide that the "application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply," MCL 440.9109(2) (2001), the commentary no longer leaves it to "other law" to determine the effect "on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or non-recording of an

assignment of the mortgagee's interest." MCL 440.9102, comment 4. Instead, MCL 440.9109 (2001), comment 7, provides:

> Subsection (b) is unchanged in substance from former Section 9-102(3). The following example provides an illustration.
>
> Example 1: O borrows $10,000 from M and secures its repayment obligation, evidenced by a promissory note, by granting to M a mortgage on O's land. This Article does not apply to the creation of the real-property mortgage. However, if M sells the promissory note to X or gives a security interest in the note to secure M's own obligation to X, this Article applies to the security interest thereby created in favor of X. The security interest in the promissory note is covered by this Article even though the note is secured by a real-property mortgage. Also, X's security interest in the note gives X an attached security interest in the mortgage lien that secures the note and, if the security interest in the note is perfected, the security interest in the mortgage lien likewise is perfected. See Sections 9-203, 9-308.
>
> It also follows from subsection (b) that an attempt to obtain or perfect a security interest in a secured obligation by complying with non-Article 9 law, *as by an assignment of record of a real-property mortgage*, would be ineffective. Finally, it is implicit from subsection (b) that one cannot obtain a security interest in a lien, such as a mortgage on real property, that is not also coupled with an equally effective security interest in the secured obligation. *This Article rejects cases such as In re Maryville Savings & Loan Corp., 743 F2d 413 (CA 6, 1984), clarified on reconsideration, 760 F2d 119 (1985).* [3 ULA 108-109 (emphasis added).]

Thus, under revised Article 9, Bedford's assignment of the mortgages securing the notes at issue to Prime would also have had no effect on its security interest.

Prime did not obtain any greater rights to the notes at issue by recording assignments of the underlying mortgages than it had under prior Article 9. Conse-

quently, notwithstanding Bedford's assignment of mortgages to Prime, Prime had only unperfected security interests in the notes at issue, which could be subordinate to the rights of other secured creditors.

### 3. BANK ONE'S INTEREST IN THE NOTES AT ISSUE

Although Bank One refers to Prime's unperfected security interests in the notes as unenforceable, under prior Article 9, even an unperfected security interest could have priority over the interests of some third parties. See MCL 440.9312(6)(b); MCL 440.9301(1). Hence, in order to ascertain whether Bank One had a superior interest in the notes and mortgages, it will be necessary to first determine what, if any, interest Bank One had in the notes and mortgages.

Under the terms of the pledge and security agreement executed as part of the $15 million facility between Bank One and Bedford, Bedford agreed to grant Bank One a security interest in certain specified "property now owned, or at any time hereafter acquired . . . ." The property included "all Mortgage Loans, including all Mortgage Notes and Mortgages evidencing such Mortgage Loans and the related Mortgage Loan Documents, which from time to time are delivered, or caused to be delivered, to the Bank . . . pursuant hereto or in respect of which an extension of credit has been made by the Bank under the Credit Agreement . . . ." Therefore, under the plain unambiguous terms of the pledge, Bedford granted Bank One a security interest in all loans—regardless of when they were originated—that were delivered to Bank One "pursuant" to the pledge.

Although the pledge contemplated that the majority of the loans would be delivered after Bank One funded the loan, the pledge also provided for the delivery of "additional Mortgage Loans" whenever the "Borrowing

Base, as reflected in any Borrowing Base Certificate or as otherwise determined by the Bank, shall, at any time, fall below the aggregate amount outstanding under the Credit Agreement or the Note . . . ." Hence, the pledge clearly contemplated that Bank One would take a security interest in *any* note and mortgage delivered under the pledge, not just the notes and mortgages originated with funds drawn on the $15 million facility. Because these provisions are unambiguous, Prime's reliance on trial testimony that Bank One actually only intended to take a security interest in notes that had been funded with Bank One's money is inapposite. *Quality Products & Concepts Co, supra* at 375. Rather, it is clear that any note delivered to Bank One under the terms of the pledge constituted collateral.

It is undisputed that Bank One asked Bedford to bring all its notes and mortgages, which included the notes at issue, to the closing to secure the funds advanced by Bank One. Consequently, by entering into the agreements and bringing the notes to the closing, Bedford gave Bank One a perfected security interest in the notes at issue. MCL 440.9304(1).

Moreover, the fact that Bedford had already granted a security interest in the notes to Prime and agreed not to further pledge them as security did not defeat Bedford's ability to grant a security interest in them to Bank One. See MCL 440.9311 ("The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default."); cf. MCL 440.9401(2) (2001). As comment 1 to MCL 440.9311 states, the purpose of this statutory provision is to "make clear that in all security transactions under this Article," the debtor retains "an interest (whether legal title or an equity) which he can

dispose of and which his creditors can reach."[11] Likewise, because prior Article 9 was—with some exceptions not relevant here—a "pure race" statute, see MCL 440.9312(6); *Yamaha Corp*, *supra* at 275, the fact that Bank One may have known that Bedford had already pledged the notes to Prime did not affect Bank One's ability to obtain and perfect a security interest in the notes. See also Example 2 to MCL 440.9312 ("Whichever secured party first perfects his interest (by taking possession of the collateral or by filing) takes priority and it makes no difference whether or not he knows of the other interest at the time he perfects his own."); cf. MCL 440.9322 (2001), comment 3 ("The rules may be regarded as adaptations of the idea, deeply rooted at common law, of a race of diligence among creditors.").

For these reasons, as of the June 1999 closing, Bank One had a perfected security interest in all the notes at issue. Although Prime's security interest in the notes was prior in time to Bank One's security interest in the same notes, because Prime's interest was unperfected, Bank One had a superior interest in the notes. MCL 440.9312(6)(a); cf. MCL 440.9322(1)(b) (2001). And, after Bedford's default, Bank One could lawfully "sell, lease or otherwise dispose of any or all of the collateral . . . ." MCL 440.9504(1).

## C. PRIME'S CLAIMS AGAINST BANK ONE FAIL AS A MATTER OF LAW

Having clarified the nature of the interests held by each of the parties in the notes and mortgages, we will now examine Prime's claims in light of these interests.

---

[11] For this reason, we reject Prime's contention that Bedford did not have "rights in the collateral" within the meaning of MCL 440.9203(1)(c). We also reject Prime's contention that Bank One did not provide value in exchange for the security interest in these notes and mortgages; the promise to lend Bedford up to $15 million coupled with an actual advance of several million dollars clearly met the requirements of MCL 440.9203(1)(b).

### 1. CONVERSION AND UNJUST ENRICHMENT

Conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins Co v Allstate Ins Co,* 439 Mich 378, 391; 486 NW2d 600 (1992). As already noted, the notes and mortgages at issue were personal property under Michigan law. *Union Guardian Trust Co, supra* at 115. However, Prime did not own the notes; Bedford did. Prime only had a security interest in the notes. And Bedford could, consistent with prior Article 9, grant a security interest in the notes to Bank One notwithstanding the fact that it had already granted a security interest in the same notes to Prime. MCL 440.9311. Further, because prior Article 9 gave Bank One's interest in the notes priority over Prime's interest, Bank One's disposition of the notes could not—as a matter of law—constitute a wrongful act of dominion that was inconsistent with Prime's rights.[12] *Foremost Ins, supra* at 391. For the same reason, Bank One's actions could not constitute unjust enrichment: Prime's interests in the notes were subordinate to Bank One's interests under prior Article 9. Therefore, Prime was not entitled to the collateral and Bank One's disposition of the notes did not result in an inequity to Prime.[13] See *Belle Isle Grill Corp v Detroit,* 256 Mich App 463, 478; 666 NW2d 271 (2003)

---

[12] Because the mortgages follow the notes by operation of law, see *Ginsberg, supra* at 717, when Bank One lawfully disposed of the notes it necessarily lawfully disposed of the corresponding mortgages.

[13] We note that there is no evidence that this case involves a situation where the disposition of the collateral could have resulted in a surplus had it been conducted in a commercially reasonable manner. See MCL 440.9502(2) (noting that the debtor has the right to surplus), MCL 440.9504(1)(c) (requiring the secured party to dispose of collateral in a commercially reasonable manner and to pay any surplus to junior lienholders) and MCL 440.9507(1) (granting other secured parties the

(noting that unjust enrichment involves the receipt of a benefit by the defendant from the plaintiff and an inequity resulting to the plaintiff because of the retention of the benefit by the defendant).

Prior Article 9 did not require Bank One to act in Prime's best interests; rather, it required Prime to protect itself by taking the necessary steps to perfect its security interests, *Yamaha Corp, supra* at 274-275 (noting that a secured creditor is not required to act in the best interests of other secured creditors and is entitled to rely on compliance with the UCC's requirements for perfection), which Prime did not do. And the provisions for default under Article 9 governed any rights that Prime may have had as a result of Bank One's handling of the disposition of the notes. See MCL 440.9501 *et seq.* and MCL 440.9601 (2001) *et seq.* Consequently, when prior Article 9 is properly applied to the facts of this case, Prime's claims for conversion and unjust enrichment necessarily fail.

### 2. AIDING AND ABETTING CONVERSION AND BREACH OF FIDUCIARY DUTY

A person may be liable for conversion "by actively aiding or abetting or conniving with another in such an act. Indeed, one may be liable for assisting another in a conversion though acting innocently." *Trail Clinic, PC v Bloch*, 114 Mich App 700, 706; 319 NW2d 638 (1982); see also *Bush v Hayes*, 286 Mich 546, 549-550; 282 NW 239 (1938). Hence, Bank One could be liable for aiding and abetting Bedford's conversion of the notes at issue. But Bedford owned the notes at issue, and it could not convert its own property. See *Foremost Ins, supra* at 391. Likewise, because it owned the notes, Bedford could

right to hold a secured party liable for losses occasioned by the failure to comply with the provisions for default).

pledge them as security for a further extension of credit, even though such a pledge might have been a breach or default of its agreements with Prime. See MCL 440.9311. Hence, Bedford's grant of a security interest in the notes to Bank One was not wrongful and cannot support a claim for conversion. *Belle Isle Grill, supra* at 478.

Finally, although Bank One could be liable for participating in the breach of a fiduciary duty owed to Prime by Bedford, *Hayes-Albion Corp v Kuberski*, 421 Mich 170, 187; 364 NW2d 609 (1984), in order to establish liability, Prime had to first demonstrate that Bedford had a fiduciary relationship with Prime. On appeal, Prime argues that Bedford was its agent for purposes of possessing the notes and, therefore, had a fiduciary duty to act in Prime's best interest with regard to the notes. However, as noted above, a debtor cannot qualify as an agent for purposes of perfecting a security interest. MCL 440.9305, comment 2. Hence, to the extent that Prime claims that Bedford was an agent for this purpose, that agency relationship was invalid. Further, examining the agreements between Bedford and Prime as a whole, it is clear that the agreements established a simple debtor-creditor relationship rather than an agency relationship with its accompanying fiduciary duties. See *Meretta v Peach*, 195 Mich App 695, 697; 491 NW2d 278 (1992) (noting that an agency relationship may arise "when there is a manifestation by the principal that the agent may act on his account"); see also *Portage Aluminum Co v Kentwood Nat'l Bank*, 106 Mich App 290, 294; 307 NW2d 761 (1981) (noting that fiduciary duties arise from "the relation subsisting between two persons of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith"). And prior Article 9 specifi-

cally contemplated that a debtor's interest in secured property could be voluntarily or involuntarily transferred to third parties notwithstanding an agreement—even an agency agreement—to the contrary. MCL 440.9311. Thus, Bedford did not have a fiduciary duty to refrain from further pledging the notes at issue.

Even if Bedford had some fiduciary duty toward Prime, Bank One had the right to rely on the provisions of Article 9 governing the creation and perfection of security interests in collateral. *Yamaha Corp, supra* at 275. Hence, under prior Article 9, Bank One could properly assume that Bedford's possession of the notes gave it the right to grant a security interest in those notes. See MCL 440.9311. And Bank One had no obligation to determine whether Bedford's decision to grant Bank One a security interest in the notes was consistent with its contractual obligations or fiduciary duties to Prime. To hold otherwise would be to inject inefficiency and uncertainty into secured transactions, because potential creditors would have to weigh the possibility that a debtor might have contractual or fiduciary duties to another creditor, which may be impaired by the creation of a new security interest in the debtor's property, against the benefits of extending credit to the debtor. See *Yamaha Corp, supra* at 274-275 (noting that the aim of prior Article 9 was to provide a simple and unified structure to enable secured transactions to go forward with less cost and greater certainty). For these reasons, we conclude that the claim that Bank One aided and abetted Bedford's breach of fiduciary duty also fails as a matter of law.

### 3. CONCLUSION

Because Prime's claims of conversion, unjust enrichment, aiding and abetting conversion, and aiding and

abetting breach of fiduciary duty against Bank One were untenable as a matter of law, these claims should never have been submitted to the jury. For the same reason, the trial court should have granted Bank One's motion for JNOV on these claims. Therefore, we reverse the trial court's denial of Bank One's motion for JNOV on these claims. Given our resolution of this issue, we need not address any of the remaining issues raised on appeal.

### III. GENERAL CONCLUSION

There were no factual disputes concerning the nature of the interests held by the parties in the notes at issue. Likewise, there were no factual disputes about the actual actions taken by each of the parties. Because Bank One's actions could not constitute conversion, unjust enrichment, or aiding and abetting conversion or breach of fiduciary duty under the undisputed facts of this case, the trial court should have granted Bank One's motion for JNOV. *Reed, supra* at 528. Therefore, we reverse the trial court's denial of Bank One's motion for JNOV and remand for entry of judgment in favor of Bank One on these four claims. Further, because the parties agree that the jury verdict did not reflect an award based on an alleged conversion of the "Edwards" check, we instruct the trial court to enter judgment in favor of Bank One on this claim too.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.